UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
Rembrandt Technologies, LP,
                                                             :

                          Plaintiff,
                                                             :

                        - against -
                                                             :

Adelphia Communications Corporation;
Century-TCI California, LP;                                  :
Century-TCI California Communications, LP;          Case No. 1:07-cv-00214 (WHP)
Century-TCI Distribution Company, LLC;                       :
Century-TCI Holdings, LLC;
Parnassos, LP;                                               :
Parnassos Communications, LP;
Parnassos Distribution Company I, LLC;                       :
Parnassos Distribution Company II, LLC;
Parnassos Holdings, LLC; and                                 :
Western NY Cablevision, LP,
                                                             :
                          Defendants.
                                                             :
-------------------------------------------------------------x

**DECLARATION OF EILISH M. CAHALAN IN SUPPORT OF
DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
TO <u>WITHDRAW THE REFERENCE TO BANKRUPTCY COURT</u>**

        I, Eilish M. Cahalan, declare under penalty of perjury, as follows:

        1.      I am an associate in the law firm of Willkie Farr & Gallagher LLP,

attorneys of record for reorganized Debtors Adelphia Communications Corporation;

Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI

Distribution Company, LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos

Communications, LP; Parnassos Distribution Company I, LLC; Parnassos Distribution

Company II, LLC; Parnassos Holdings, LLC; and Western NY Cablevision, LP (collectively, "Defendants").

2.      I submit this declaration in support of Defendants' Memorandum In Opposition To Plaintiff's Motion To Withdraw The Reference To Bankruptcy Court.

3.      Attached as Exhibit A is a true and accurate copy of an October 16, 2006 letter from Brooke A.M. Taylor to Roger Netzer.

4.      Attached as Exhibit B is a true and accurate copy of Rembrandt's First Request for the Production of Documents In the Adversary Proceeding, dated October 20, 2006.

5.      Attached as Exhibit C is a true and accurate copy of the November 14, 2006 hearing transcript.

6.      Attached as Exhibit D is a true and accurate copy of a November 15, 2006 stipulation and proposed order.

7.      Attached as Exhibit E is a true and accurate copy of the November 22, 2006 Objection of Rembrandt Technologies, LP to Confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors.

8.      Attached as Exhibit F is a true and accurate copy of the December 13, 2006 Stipulated Order Establishing Separate Reserve for Rembrandt Technologies, LP Administrative Claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2th day of March 2007 at New York, New York.


 /s/ Eilish M. Cahalan____

Eilish M. Cahalan

**<u>Exhibit A</u>**

# susman godfrey l.l.p.
a registered limited liability partnership
## ATTORNEYS AT LAW
Suite 3800
1201 Third Avenue
Seattle, Washington 98101-3000
(206) 516-3880
www.susmangodfrey.com

---

| | | | |
|---|---|---|---|
| Suite 5100 | Suite 5100 | Suite 950 | 8th Floor |
| 1000 Louisiana Street | 901 Main Street | 1901 Avenue of the Stars | 590 Madison Avenue |
| Houston, Texas 77002-5096 | Dallas, Texas 75202-3775 | Los Angeles, California 90067-6029 | New York, New York 10022-8521 |
| (713) 651-9366 | (214) 754-1900 | (310) 789-3100 | (212) 336-8330 |

---

Brooke A. M. Taylor
Direct Dial (206) 373-7383

Direct Dial Fax (206) 516-3883
E-Mail BTaylor@susmangodfrey.com

October 16, 2006

***VIA EMAIL***

Roger Netzer
Willkie Farr & Gallagher
787 Seventh Avenue
New York, N.Y. 10019-6099

Re:     *Rembrandt Technologies, LP v. Adelphia Communications Corporation, et. al.*; Docket
        No. 06-01739-REG; United States Bankruptcy Court, Southern District of New York.

Dear Roger:

Thanks for speaking with us last week and for your letter received on October 13 (note that the letter was dated October 12, but it was actually emailed to us on October 13 by Mark Ryan of your firm).

As you may know, Rembrandt enforces its patent portfolio selectively and seriously. The patents asserted against Adelphia and the JV Debtors are a fraction of Rembrandt's total intellectual property portfolio and were chosen carefully. You may also know that Rembrandt is presently prosecuting patent infringement suits against other major cable companies including Comcast, Charter Communications, Cablevision, and Cox Communications. Indeed, Rembrandt has asserted the patents asserted in this case (plus additional patents) against Time Warner Cable. In addition to Susman Godfrey and Shearman and & Sterling LLP, Rembrandt is represented by the law firms of Fish & Richardson, Beck Redden & Secrest, and McKool Smith.

Today, October 16, 2006, we received your letter enclosing discovery requests. As you are aware, the Federal Rules prohibit commencing discovery in an adversary proceeding in advance of the parties' Rule 26(f) conference which we have not yet convened. We understand from your conversation that Adelphia is interested in the Bankruptcy Court conducting an estimation hearing prior to the plan confirmation hearing. We propose that we hold a meeting this

714225v1/9750
714225v1

October 16, 2006
Page 2

Thursday, October 19, 2006 in New York so the parties can discuss the timetable for such estimation hearing, including the briefing schedule and the scope and timing of discovery. In addition, we can discuss how to treat your improper discovery requests. I will give you a call to confirm your availability for the October 19 meeting. We are prepared to produce relevant material to Adelphia next week, but in order to so, we need an agreement by both parties as to the procedures and limits of discovery.

We are willing to work with you to limit and to expedite discovery, but we need to meet and confer with you in order to accomplish this task. Below is a non-exhaustive list of discovery that Rembrandt requires from the JV Debtors and Adelphia (collectively, "Adelphia") -- all of it standard in patent case.

<u>Requests for Production</u>

1.    Documents sufficient to show cable-modem-related revenue from June 2002 until 31 July 2006.

2.    Documents sufficient to show the Adelphia's method and/or system of remotely uploading operating software in cable modems.

3.    Documents sufficient to show Adelphia's method and/or system of error control protocol selection.

4.    Documents sufficient to show Adelphia's method and/or system of data transmission preamble coding with a lower bit-per-symbol rate.

5.    Documents sufficient to show any and all investigation regarding potential patent infringement that Adelphia undertook prior to providing the accused cable modem services.

6.    All documents related to Adelphia's compliance with DOCSIS standards.

7.    All documents mentioning or concerning any of the Patents-in-Suit or their applications.

8.    All documents concerning your knowledge of any of the Patents-in-Suit, including documents indicating when you became aware of any of the Patents-in-Suit.

9.    All correspondence with counsel and other documents expressing opinions on or concerning the validity, invalidity, infringement, non-infringement, enforceability, non-enforceability, or license (either express of implied) as to any of the Patents-in-Suit.

714225v1

October 16, 2006
Page 3

10. All documents and things created or gathered prior to the filing of the Complaint by Rembrandt concerning the results of any prior art search directed to, or relating to, or containing any of the Patents-in-Suit.

11. All documents concerning the results of any prior art search directed to the Patents-in-Suit.

12. All documents concerning your policies or practices concerning patent clearances, right to use opinions, or other mechanisms to avoid your infringement of the Patents-in-Suit.

13. All documents concerning your contentions on reasonable royalties pursuant to 35 U.S.C. § 284 for any infringement of the Patents-in-Suit.

14. All documents concerning any analysis, opinion, or inquiry regarding potential infringement of the inventions claims in each of the Patents-in-Suit, including, but not limited to any documents concerning or relating to pre-litigation investigations performed by or on behalf of Adelphia, Adelphia's partners, Adelphia's licensors, Adelphia's customers, Adelphia's resellers, and/or Adelphia's affiliates, relating to the potential infringement by any products or systems made, used, offered for sale, and/or sold by Adelphia, Adelphia's partners, Adelphia's licensors, Adelphia's customers, Adelphia's resellers, and/or Adelphia's affiliates.

15. All documents relating to any communications with Adelphia's sales force, agents, dealers, wholesalers, retailers, representatives, distributors, the press, or any news wire concerning any of the Patents-in-Suit.

16. All documents relating or referring to the indemnification or offer to indemnify, or request for indemnification by any of Adelphia's customers, prospective customers, or third-parties with respect to the Patents-in-Suit.

17. All documents furnished to or shown to any fact witness contacted, interviewed, or consulted by Adelphia or its agents or attorneys in connection with the Patents-in-Suit.

18. Any and all documents concerning any analyses or efforts by You to design any products around the Patents-in-Suit.

19. Any and all documents concerning past sales, manufacturing, research or development, present sales, manufacturing, research, licenses or development, and projected or contemplated future sales, manufacturing, research, license or development of any Adelphia product within the scope of the inventions claimed in each of the Patents-in-Suit.

October 16, 2006
Page 4

20.    Any and all documents concerning catalogs, code (including executable or compatible code), product specifications, flowcharts, models, drawings, promotional literature, advertising, engineering design, engineering analysis and testing, for any of Adelphia's products within the scope of the inventions claimed in each of the Patents-in-Suit.

21.    All documents sufficient to show all sales and revenue information for the Accused Products from 2002 to the present, broken down by quarter, including all documents sufficient to explain any acronyms or terminology employed by Adelphia's accounting system.

22.    All invention disclosures or pending or abandoned patent applications covering or concerning any aspect of the Accused Products.

23.    All manuals for the Accused Products since 1998.

24.    All documents relating to the promotion or advertising of the Accused Products since 1998.

25.    All documents relating to the pricing of the Accused Products since 1998.

26.    All documents sufficient to identify all current and former customers, clients, licensees, and/or resellers of the Accused Products since 1998.

27.    All documents that refer or relate to market surveys, market analyses, and/or forecasts of customer demand for the Accused Products since 1998.

28.    All documents that relate to the accounting practices used by Adelphia to account for the sales and income for the Accused Products since 1998.

29.    All documents relating to Adelphia's market share in the Accused Products' markets since 1998.

30.    All documents concerning any license, royalty, technology transfer, or authorization-to-use agreements entered into by Adelphia since 1998 relating in any way to the Accused Products.

31.    All documents relating to Adelphia's policies or practices concerning Adelphia's entry into license, royalty, technology transfer, or authorization-to-use agreements since 1998.

32.    All documents that refer or relate to any prior art reference that Adelphia believes anticipate or render obvious any of the patents-in-suit.

October 16, 2006
Page 5

33.     All documents that refer or relate to any document that Adelphia believes is relevant to the construction or interpretation of any claim of the patents-in-suit.

34.     All documents that reference the named inventors of the patents-in-suit.

35.     All documents that support or relate to a contention that the patents-in-suit were not duly and legally issued.

36.     All documents that support or relate to the contention that Adelphia has not infringed, induced the infringement of, or contributed to the infringement of the patents-in-suit.

37.     All source code, design documents, interface specifications, users manuals, and operation documents related to the storage and retrieval of leads and purchase requests from Adelphia database(s), including all procedures for storing leads, database templates, access procedures, access controls, web access interface specifications, specifications for purchase request and lead records within the database and instructions for dealer access.

<u>Interrogatories</u>

1.     List all patents related to cable modem technology of which Adelphia had knowledge prior to its entry into the cable modem market.

2.     Describe all means by which cable modems on Adelphia's system update their operating software.

3.     Describe all means by which cable modems on Adelphia's system engage in error protocol negotiation.

4.     Describe all means by which cable modems on Adelphia's system transmit preambles.

5.     Describe all procedures undertaken by Adelphia to investigate and assure compliance with DOCSIS standards.

6.     Describe the cable head end equipment utilized by Adelphia.

7.     State Adelphia's revenues by quarter for any services related to high-speed data transmission.

8.     To the extent Defendants contend that any asserted patent is invalid for anticipation or obviousness, fully and separately explain for each such basis of invalidity how a prior art system renders obvious the claimed invention. The explanation should include an identification of how each prior art system or combination of prior art

October 16, 2006
Page 6

systems satisfies the limitations of the claims of the asserted patents, and for each combination of prior art systems an explanation of why Defendants it is proper to combine the prior art systems for the purposes of obviousness.

9.      To the extent Defendants contend that any claim of a patent-in-suit is invalid for any purported violated of 35 U.S.C. § 112, fully and separately explain the basis for this invalidity assertion, including identifying the allegedly invalidating claim language and explaining fully and completely Defendants' basis for alleging why that claim language constitutes a violation of § 112.

10.     To the extent that Defendants contend that any claim of the patents-in-suit are invalid for being on sale, fully and completely describe the basis for that allegation.

11.     State each and every fact, including persons knowledgeable about such facts, supporting a contention that Defendant does not infringe the Patents-in-Suit.

12.     State each and every fact, including persons knowledgeable about those facts, supporting a contention that the present action is barred under the Doctrine of Laches, including how Defendant has been prejudiced by any alleged delay by Rembrandt.

13.     State the earliest date on which Defendant became aware of the Patents-in-Suit, describe how Defendant became aware of each patent, and identify the persons who are most knowledgeable about the circumstances under which Defendant became aware of each patent.

14.     Identify all non-infringing uses for Defendant's Accused Products.

15.     Identify all engineers, scientist, computer programmers and technicians involved in the research, development, testing and commercial implementation of the accused system and components forming the accused system.  For each person identified provide a) the person's name b) job title, c) affiliation with Adelphia d) date of hire and e) employment history with Adelphia.

16.     Identify all source code, design documents, interface specifications, users manuals, and operation documents related to the storage and retrieval of leads and purchase requests from Adelphia database(s), including all procedures for storing leads, database templates, access procedures, access controls, web access interface specifications, specifications for purchase request and lead records within the database and instructions for dealer access.

17.     Identify all searches or investigations relating to the scope, validity, infringement or enforceability of each of the Patents-in-Suit, for each such search or investigation identifying all persons involved and its date.

714225v1

October 16, 2006
Page 7

18.     If Adelphia contends that Rembrandt's claims are barred by the doctrines of acquiescence or equitable estoppel, describe the basis for Adelphia's contention, including how Rembrandt led Adelphia to believe that Rembrandt would not assert against Adelphia the claims in this lawsuit and how Adelphia relied on that belief to its detriment.

19.     If Adelphia contends that there are indispensable parties that must be joined in this action, identify each such indispensable party and describe why that party must be joined.

20.     If Adelphia contends that Rembrandt's claims are barred by the doctrine of unclean hands, describe the basis for Adelphia's contention.

21.     If Adelphia contends that any claim of the Patents-in-Suit is unenforceable, for each such claim:
    (a)    state the grounds for unenforceability;
    (b)    identify all documents that refer or relate to or which support such contention;
    (c)    state how each document identified supports a contention of unenforceability; and
    (d)    identify each person (other than counsel) who has knowledge of the facts relating to or supporting such contention.

## Depositions

1.     Person most knowledgeable about DOCSIS compliance procedures.

2.     Person most knowledgeable about remote cable modem operating system upgrade.

3.     Person most knowledgeable about remote cable modem error protocol negotiation.

4.     Person most knowledgeable about remote cable modem "burst" preamble transmission.

5.     Person most knowledge about Adelphia's cable modem architecture and design.

6.     Person most knowledgeable about Adelphia's revenues during the accused period.

7.     Person most knowledge about the cable head end equipment utilized by Adelphia.

## Requests for Admission

1.     Adelphia's admission that it provided cable modem services that comply with DOCSIS 1.1 from June 2002 through July 2003.

714225v1

October 16, 2006
Page 8

2.   Adelphia's admission that it provided cable modem services that comply with DOCSIS 2 from July 2003 through July 2006.

3.   Adelphia's admission that between June 2002 and July 2006, Adelphia provided cable modem services in which the modem operating software is remotely updated.

4.   Adelphia's admission that between June 2002 and July 2006, Adelphia provided cable modem services in which the preamble is transmitted in a lower bit-per-symbol rate than the subsequent data in standard data transmissions.

5.   Adelphia's admission that, between June 2002 and July 2006, total revenue for Adelphia's cable modem services exceeded $16,800,000,000 dollars.

6.   Admit that Adelphia had knowledge of U.S. Patent No. 5,710,761 prior to September 13, 2006.

7.   Admit that Adelphia had knowledge of U.S. Patent No. 5,778,234 prior to September 13, 2006.

8.   Admit that Adelphia had knowledge of U.S. Patent No. 6,131,159 prior to September 13, 2006.

9.   Admit that Adelphia had knowledge of U.S. Patent No. 6,950,444 prior to September 13, 2006.

Though this is not a complete list of discovery required of Adelphia, I hope this list provides a framework for our next discussion so we can agree on a reasonable timetable and scope for formal discovery.

Also, please consider the below list of discovery agreements and let me know if you are willing to agree to them. These agreements advantage neither side but make discovery more efficient for the parties.

1.   As to any discovery dispute, the lead lawyers will try to resolve by phone and no one will write letters to the other: just e-mail and phone calls.

2.   Depositions will be taken by agreement, with both sides alternating and trying in advance to agree upon the dates for depositions, even before the deponents are identified.

3.   The parties will use the same court reporter/videographer, who agrees to provide specified services at discounted prices for the right to transcribe all depositions.

714225v1

October 16, 2006
Page 9

4.    All papers will be served on the opposing party by e-mail.

5.    Documents will be produced on a rolling basis as soon as they have been located and numbered; if copies are produced, the originals will be made available for inspection upon request.

6.    If agreement cannot be reached on the form of a protective order within 48 hours of the time they are exchanged, both sides will write a letter to Court including each's preferred version and, without argument, ask Court to select one or the other as soon as possible.

7.    All deposition exhibits will be numbered sequentially X-1, X-2, etc., regardless of the identity of the deponent or the side introducing the exhibit and the same numbers will be used in pretrial motions and at trial.

8.    The parties will share the expense of imaging all deposition exhibits.

9.    Neither side will be entitled to discovery of communications between counsel and expert witnesses or to drafts of experts reports.

10.   Documents that the other side claims are privileged can be snapped back as soon as it is discovered they were produced without any need to show the production was inadvertent.


I look forward to working with you to formulate a discovery plan.

Sincerely,

Brooke A. M. Taylor

**Exhibit B**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In Re: Adelphia Communications Corporation, et al. | ) ) ) | Chapter 11 Case No. 02-41729 (REG) |
| Debtors | ) ) | Jointly Administered |
| _____ | ) | |
| Rembrandt Technologies LP | ) ) | |
| *Plaintiff* | ) ) | Adversary Proceeding |
| | ) ) | No. <u>06-01739-REG</u> |
| v. | ) ) | |
| Adelphia Communications Corporation; Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI Distribution Company, LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos Communications, LP; Parnassos Distribution Company I, LLC; Parnassos Distribution Company II, LLC Parnassos Holdings, LLC Western NY Cablevision, LP | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants* | ) ) | |
| _____ | ) | |

REMBRANDT TECHNOLOGIES LP FIRST REQUEST
<u>FOR THE PRODUCTION OF DOCUMENTS</u>

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure Plaintiff Rembrandt

Technologies LP ("Rembrandt") hereby requests and demands that Adelphia Communications

Corporation, Century-TCI California, LP, Century-TCI California Communications, LP,

Century-TCI Distribution Company, LLC, Century-TCI Holdings, LLC, Parnassos, LP,

Parnassos Communications, LP, Parnassos Distribution Company I, LLC, Parnassos Distribution

Company II, LLC, Parnassos Holdings, LLC, Western NY Cablevision, LP. (collectively,

"Adelphia") produce for inspection and copying at the offices of Susman Godfrey L.L.P., 590

Madison Avenue, 8th Floor, New York, New York, or such other place as may be mutually

agreed upon, by October 30  2006, each document as is hereinafter specified.

<u>DEFINITIONS</u>

1.    The phrase "RELATING TO" means discussing, describing, referring to, pertaining to, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

2.    The term "DOCUMENT" or "DOCUMENTS" is used in the broadest sense permitted by the Federal Rules of Civil Procedure and means the original (or any copy when originals are not available) and any drafts or non-identical copies thereof, whether different from the original because of interlineation, receipt stamp, notation of copy sent or received or otherwise, of any book, pamphlet, periodical, letter, report, note, memorandum, record, minutes, calendar or diary entry, transcript, study, compilation, analysis, tabulation, map, diagram, drawing, plan, picture, summary, working paper, chart, paper, graph index, data sheet, data processing card, computer printout, summary of a computer printout, tape, contract, agreement, lease, ledger, journal, balance sheet, account, invoice, purchase order, receipt, billing record, financial data, financial statement, file, diary, film, trip tickets, telex, teletype or other messages, telegram, expense vouchers, instructions, bulletins or any other writing or recording of information, however produced, recorded, maintained or reproduced, including any electronic or mechanical recording of any oral material, within the possession, custody or control of plaintiff or any of its officers, directors, employees, attorneys, or other agents and/or representatives.

3.    The term "INCLUDING" shall mean including but not limited to.

4.    The term "PERSON" means natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal or governmental entity or association, including any directors, officers, employees, agents or representatives thereof.

5.    The terms "Defendants" or "Adelphia" shall mean Defendants shall mean Defendant Corporations as in the above caption, their subsidiaries, affiliates, divisions, successors or assignees, and their respective officers, directors, employees and agents.

6.    The terms "AND" and "OR" shall be construed disjunctively or conjunctively as necessary to bring within the scope of these requests all documents which might otherwise be construed to be outside their scope.

7.    The term "ALL" shall mean any and all, and the term "ANY" shall mean any and all, unless the context clearly requires otherwise.

8.    References to the singular shall include the plural, and references to the plural shall include the singular as may be appropriate to construe the individual document requests in the broadest form.

9.    The masculine form of a noun or pronoun shall be considered to include within its meaning the feminine form of the noun or pronoun, and vice versa as may be appropriate to make the individual document requests inclusive rather than exclusive.

10.    The term "Patents-in-Suit" shall mean the following patent numbers:  6,131,159; 5,710,761; 5,778,234; and 6,950,444.

11.    The term "Accused Products and Services" shall include all Adelphia services or products that involve in any way the use of a cable modem.

12.     The term "DOCSIS" shall refer to the commonly known industry standards referred to as DOCSIS 1.0, DOCSIS 1.1, and DOCSIS 2.0.

<u>INSTRUCTIONS</u>

1.     Responsive documents shall be produced as they have been kept in the usual course of business and shall not be shuffled or otherwise rearranged.  Alternatively, plaintiff may produce responsive documents organized and labeled to correspond to the enumerated requests of this demand.  If any portion of any document is responsive to any request, then the entire document must be produced.  Documents that are found stapled, clipped, or otherwise fastened together shall be produced in such form.  If there is no document responsive to any particular category, Adelphia shall so state in writing.

2.     If any portion of a document is responsive to an individual document request, then the entire document shall be produced.

3.     If information stored in, or accessible through, computer or other data retrieval systems is produced, it must be accompanied with instructions and all other materials necessary to use or interpret such data.

4.     All documents which cannot be legibly copied should be produced in their original form.

5.     Each individual document request set forth herein shall be construed independently and not with reference to any other request for purposes of limitation unless a particular request so specifies.

6.    Where specific documents are listed as part of a general category of documents, then such listed documents as well as all other documents falling within such general category shall be produced.

7.    If any responsive document is withheld under a claim of privilege, Defendants shall furnish a list specifying each such document and setting forth the following information:  (i) the date of the document; (ii) the number of pages of the document; (iii) the name and last known address of each person who prepared or participated in the preparation of the document; (iv) the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed; (v) a summary of the general subject matter of the document (and such other information as is necessary to identify the document); (vi) a statement of the basis upon which the asserted privilege is claimed; and (vii) the individual document request herein to which the document is responsive.

8.    If any document responsive to this request once existed but has been destroyed or discarded, or is otherwise not capable of being produced, Defendants shall furnish a list specifying each such document and setting forth the following information: (i) the date of the document; (ii) a description of the subject matter of the document; (iii) the name and last known address of each person who prepared or participated in the preparation of the document; (iv) the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed; (v) the name and last known address of any person not covered by items (iii) and (iv) who had

possession, custody or control of the document or a copy thereof; (vi) the date on which the document was destroyed or discarded and a statement of the reasons why the document was destroyed or discarded or why such document is not capable of being produced; and (vii) the individual document request herein to which the document is responsive.

9.   Unless otherwise specified, the time period covered by each individual request herein is January 1, 2002 to present.

10.  This request for documents shall be deemed continuing in nature so as to require prompt supplemental responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure in the event plaintiff becomes aware of, or acquires within its possession, custody or control, additional responsive documents at any time hereafter.

<u>REQUESTS FOR PRODUCTION</u>

1.   Documents, including source code, design documents, interface or product specifications, flowcharts, models, drawings, promotional literature, advertising, engineering design, engineering analysis and testing, user manuals, instruction manuals, catalogs, and operation documents, sufficient to show, for every cable modem sold or leased by Adelphia:

   A.  the system or method for remotely uploading operating software in cable modems;

   B.  the system or method for error control protocol selection; and

   C.  the system or method for data transmission preamble coding with a lower bit-per-symbol rate.

2.    All documents that describe, picture, diagram, mention, or refer to Adelphia's reference architecture for the data-over-cable services and interfaces network architecture, including, but not limited to, such documents relating to the elements in the architecture, the protocols used to communicate between each of the network architecture components, the version numbers of any protocols, and the configuration profiles for the network elements.

3.    All documents relating to cable modem termination systems used by Adelphia or in conjunction with Adelphia's cable offerings, including product descriptions, manuals, tutorials, user references or the like, and including the model numbers of all cable modem termination systems used.

4.    All documents  relating to cable modem termination system upstream channel descriptors used by Adelphia or in conjunction with Adelphia's cable offerings, including a list of all upstream channel descriptors used for the various configurations and network architectures.

5.    Documents sufficient to show cable-modem-related revenue from June 2002 until 31 July 2006.

6.    Documents sufficient to show Adelphia's compliance with DOCSIS standards for its cable modems from 2001 through July 31, 2006.

7.    All documents mentioning or concerning any of the Patents-in-Suit, their applications, or the named inventors of the Patents-in-Suit.

8.    All documents concerning your knowledge of any of the Patents-in-Suit, including documents indicating when you became aware of any of the Patents-in-Suit.

9.    All documents concerning any analysis, opinion, or inquiry regarding potential
infringement of the inventions' claims in each of the Patents-in-Suit, including, but
not limited to any documents concerning or relating to pre-litigation investigations
performed by or on behalf of Adelphia, Adelphia's partners, Adelphia's licensors,
Adelphia's customers, Adelphia's resellers, and/or Adelphia's affiliates, relating to
the potential infringement by any products or systems made, used, offered for sale,
and/or sold by Adelphia, Adelphia's partners, Adelphia's licensors, Adelphia's
customers, Adelphia's resellers, and/or Adelphia's affiliates.

10.    All documents furnished to or shown to any fact witness contacted, interviewed, or
consulted by Adelphia or its agents or attorneys in connection with the Patents-in-
Suit.

11.    All documents sufficient to show all sales and revenue information for the Accused
Products and Services from 2002 to the present, broken down by quarter, including
all documents sufficient to explain any acronyms or terminology employed by
Adelphia's accounting systems.

12.    All documents concerning the pricing of the Accused Products and Services since
2002.

13.    All documents concerning market surveys, market analyses, and/or forecast customer
demand for the Accused Products and Services since 2002.

14.    All documents concerning any license, royalty, technology transfer, or authorization-
to-use agreements entered into by Adelphia since 2002 relating in any way to the
Accused Products and Services.

15.    All documents concerning any prior art reference that Adelphia believes anticipates or renders obvious any of the Patents-in-Suit.

16.    All documents concerning any analysis, opinion, or inquiry as to the amount of cash to be reserved on the effective date (the "Effective Date") of the Fifth Amended Joint Plan of Reorganization (the "Plan") for distribution to holders of administrative claims, including but not limited to claims filed after confirmation of the Plan and prior to the bar date for such claims.

17.    All documents concerning any analysis, opinion, or inquiry as to the sources and amount of cash to satisfy administrative claims that are Allowed (as defined in the Plan) after the Effective Date.

18.    All documents concerning any analysis, opinion, or inquiry regarding any administrative claims projected to be filed after confirmation of the Plan.


Dated:  October *20* 2006.              **SUSMAN GODFREY L.L.P.**

                                        By: _Vineet Bhatia w/p Brooke T.___
                                        VINEET BHATIA (VB 9964)
                                        MAX L. TRIBBLE, JR.
                                        Texas Bar 20213950 (*application pending*)
                                        EDGAR SARGENT
                                        Washington Bar 28283 (*application pending*)
                                        BROOKE A.M. TAYLOR
                                        Washington Bar 33190 (*application pending*)
                                        TIBOR L. NAGY
                                        Texas Bar 24041562 (*application pending*)

                                        SUSMAN GODFREY L.L.P.
                                        590 Madison Ave., 8th Floor
                                        New York, NY 10022

Main Telephone: (212) 336-8330
Main Fax: (212) 336-8340
Email: vbhatia@susmangodfrey.com
Email: mtribble@susmangodfrey.com
Email: esargent@susmangodfrey.com
Email: btaylor@susmangodfrey.com
Email: tnagy@susmangodfrey.com

JAMES L. GARRITY, JR. (JG 8389)
MARC B. HANKIN (MH 7001)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Main Telephone: (212) 848 4000
Main Fax: (212) 848 7179
Email: jgarrity@shearman.com
Email: MHankin@Shearman.com

# Exhibit C

```
1                   UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
2                                       .
   IN RE:                               .  Case No. 02-41729
3                                       .
   ADELPHIA COMMUNICATIONS,             .  New York, New York
4                                       .  Tuesday, November 14, 2006
                          Debtors.      .  9:39 a.m.
5  . . . . . . . . . . . . . . .
   REMBRANDT TECHNOLOGIES, LP,          .
6                                       .
                          Plaintiff,    .
7                                       .
          v.                            .  Adv. Proc. No. 06-1739
8                                       .
   ADELPHIA COMMUNICATIONS,             .
9                                       .
                          Defendant.    .
10 . . . . . . . . . . . . . . .

11              TRANSCRIPT OF PRETRIAL CONFERENCE
             BEFORE THE HONORABLE ROBERT E. GERBER
12                UNITED STATES BANKRUPTCY JUDGE

13 APPEARANCES:
   For the Plaintiff:           James L. Garrity, Jr., Esq.
14                              SHEARMAN & STERLING, LLP
                                599 Lexington Avenue
15                              New York, New York 10022-6069
                                (212) 848-4000
16
                                Joseph S. Grinstein, Esq.
17                              Tibor L. Nagy, Esq.
                                SUSMAN GODFREY, LLP
18                              590 Madison Avenue, 8th Floor
                                New York, New York  10022-8521
19                              (212) 336-8332
   (Appearances continued)
20
   Audio Operator:             Electronically Recorded
21                              by Court Personnel

22 Transcription Company:       Rand Transcript Service, Inc.
                                311 Cheyenne Road
23                              Lafayette, New Jersey  07848
                                (973) 383-6977
24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.
```

1
    APPEARANCES:   (Continued)
2

3
    For the Defendant:           Shelley Chapman, Esq.
4                                  Roger Netzer, Esq.
                                 Thomas Meloro, Esq.
5                                  WILLKIE, FARR & GALLAGHER, LLP
                                 787 Seventh Avenue
6                                  New York, New York  10014
                                 (212) 728-8000
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                                                              Page
     ARGUMENT
3          By Mr. Grinstein                                      5
           By Mr. Garrity                                     15,22
4          By Mr. Netzer                                        16
           By Ms. Chapman                                       18
5          By Mr. Meloro                                         23
           Court Decision - reserved                            30
6
     PRETRIAL CONFERENCE/SCHEDULING                              31
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commence at 9:39 a.m.)

2         THE COURT:  Okay.  We're here on a pretrial

3    conference, what I believe is the first pretrial conference

4    in this adversary.  I -- Mr. Garrity, I know you and I know

5    some of the folks at the other counsel table.  I don't know

6    everybody.  Do you want to make some introductions?

7         MR. GARRITY:  I'd be happy to, Your Honor.  Good

8    morning.  Jim Garrity from Shearman & Sterling.  Your Honor,

9    we are co-counsel principally for bankruptcy purposes of

10   Rembrandt Technologies, LP, the plaintiff in this adversary

11   proceeding.

12        At counsel table with me are Joseph Grinstein and

13   Tibor Nagy.  Mr. Grinstein and Mr. Nagy are with the Susman

14   Godfrey firm and they are co-counsel in this matter and when

15   we get to, if Your Honor will allow us a moment or two to

16   talk about the complaint and the matters at issue, I will

17   turn the floor over to them, if that's all right with you.

18        THE COURT:  Okay.  Ms. Chapman, I know you and Mr.

19   Netzer.  And in between you is?

20        MS. CHAPMAN:  Good morning, Your Honor.  In between

21   us is our partner Tom Meloro, who is a patent specialist and

22   who will be addressing the merits, if, as, and when we get to

23   that today.

24        THE COURT:  Okay.  I think it would be constructive

25   if we spent just a couple of minutes for you folks to tell me

1    the underlying issues.  It's my impression, very

2    impressionistically, that this is a case for -- an action for

3    alleged post-petition patent infringement.  I don't know if

4    I'm fully correct or not.

5           Mr. Grinstein or Mr. Nagy, you want to give me a

6    more detailed discussion of what it's about?

7           MR. GRINSTEIN:  Yes, Your Honor.  Joseph Grinstein

8    for plaintiff Rembrandt.

9           Just as an administrative matter, my pro hac

10   admission is pending, but has not been acted on, so --

11          THE COURT:  Okay.  Certainly you can speak today and

12   I have no doubt that it will be granted.  Go ahead.

13          MR. GRINSTEIN:  Thank you, Your Honor.

14          This is a patent infringement case, as you

15   mentioned.  The complaint was filed in September.  It relates

16   solely to post-petition alleged infringement by the debtors.

17   By agreement the debtors have not yet answered the complaint.

18   Their answer will be due in a few weeks.

19          THE COURT:  Pause, please, Mr. Grinstein.

20          A patent with respect to what kind of a product or

21   technology?

22          MR. GRINSTEIN:  There are four patents that are

23   asserted in this case.  They relate to the debtors' cable

24   modem services.  More specifically, there is a standard by

25   which the entire industry performs cable modem services.

1    That standard is called "DOCSIS," d-o-c-s-I-s.  It stands for

2    "data over cable system interface specification."  It's a lot

3    of words.

4              That is a standard that all of the cable companies

5    got together in the late 1990s and formed as a way of making

6    sure that each person's or each company's cable modems were

7    compatible with each other; in other words, an industry

8    standard designed to insure efficiency, reliability,

9    compatibility.

10             The allegation in this case by Rembrandt, the

11   plaintiff, is that the DOCSIS standard infringes four of

12   Rembrandt's patents and, by extension, any cable modem

13   services that the debtors performed that were compliant with

14   the DOCSIS standard, which would have been all of them, by

15   implication therefore also infringed the patents.

16             THE COURT:  Now pause, please.

17             If the DOCSIS system is uniformly used across the

18   industry, so by way of example I could, you know, go out to a

19   J&R Music World and get a cable modem there and use it on a

20   Time Warner system or a Comcast system, was there anything

21   that Adelphia did unique to the industry or do you have this

22   claim going out against all of the cable companies in the

23   United States?

24             MR. GRINSTEIN:  We're making this claim against

25   other cable companies:  Time Warner, Comcast.  I'm not sure

1  if every cable company was yet got to, but we are making this

2  claim against other cable companies.

3          The allegation is that Adelphia, by the fact that

4  it's standardized to this industry-wide standard, the

5  industry-wide standard infringes our patents.  So as long as

6  Adelphia was compliant with the standard, and there's no

7  reason to believe that they weren't compliant with the

8  standard or else their cable modem system would not have

9  worked, they're alleged to have infringed.

10         THE COURT:  Now, did I hear you right that you have

11 similar actions pending against other major cable companies?

12         MR. GRINSTEIN:  We do, Your Honor.

13         THE COURT:  And where are they pending?

14         MR. GRINSTEIN:  I believe we have action pending in

15 the eastern district of Texas and I think Delaware as well.

16 Not so sure about -- eastern district of Texas is at least

17 one of them.

18         THE COURT:  And they're all being prosecuted

19 individually?

20         MR. GRINSTEIN:  Yes, Your Honor.

21         THE COURT:  Go on.

22         MR. GRINSTEIN:  There are four patents at issue in

23 this case.  The patents were originally developed by a

24 subsidiary of AT&T/Bell Labs known as Paradyne Corporation.

25 Paradyne was one of the leaders and sort of at the forefront

1   of modem technology back in the 1990s.  A lot of what we see

2   today out in the modem marketplace was due to Paradyne's

3   work.  Rembrandt, the client who is at issue -- who is here

4   today, acquired those patents from Paradyne and is now

5   serving them in this particular case.

6        There are four patents.  They relate specifically to

7   three areas of technology, three distinct methods of

8   infringement.  The first two patents are somewhat related.

9   They're the 159 patent and the 234 patent.  Both of those

10  patents we allege are infringed by the DOCSIS standards that

11  relate to the manner by which cable modems download and

12  update new program content.

13       From time to time a cable modem needs to update its

14  operating system, get updated, get upgrades.

15       THE COURT:  You talking about updating the firmware

16  inside the modem as compared and contrasted to the

17  programming content that the modem sucks off the internet?

18       MR. GRINSTEIN:  Right.  It's the operating systems.

19  You can call it the firmware in the modem.  That's being

20  updated through this download process.  And those patents

21  relate to the DOCSIS standard about how that downloading is

22  to occur.  Those are the 159 and 234 patents.  That's the

23  first area of infringement that we've alleged.

24       The second area of infringement that we've alleged

25  relates to the 761 patent, and that is a patent that covers

1   the manner by which cable modems communicate error control

2   correction mechanisms.  One of the more important things that

3   a cable modem does when it's doing data transmission is

4   control for errors.

5          THE COURT:  Well, any modem, cable or otherwise,

6   right?

7          MR. GRINSTEIN:  Certainly, Your Honor.  And the

8   DOCSIS standard sets out a particular method by which cable

9   modem services are supposed to obtain this error control

10  correction mechanism.  The 761 patent, we allege, covers that

11  DOCSIS standard.

12         The third distinct patent is the 444 patent.  The

13  444 patent covers a particular aspect of data transmission by

14  cable modems.  Specifically, it's very important when you're

15  --

16         THE COURT:  Could you repeat that, please, Mr.

17  Grinstein?

18         MR. GRINSTEIN:  Yes.  It's the 444 patent, and it

19  covers a DOCSIS standard that governs data transmission by

20  modems.  More specifically, when you're doing data

21  transmission in a modem, data is transmitted in blocks and

22  chunks.  And it's very important that you delimit the

23  beginning and the end of a particular block of data.

24         The 444 patent relates to the DOCSIS standard for

25  delimiting the beginning and the end of a particular data

1    transmission, and that's particularly critical to exploiting

2    the extent of a potential bandwidth on the system.

3            So those are the three patents -- actually four

4    patents, but they're related to three areas of technology.

5    We've alleged that DOCSIS infringes those patents and, by

6    implication, the defendant's products that -- products and

7    services, I should say, that utilize DOCSIS.

8            Where do we stand right now, Your Honor?  We -- as I

9    mentioned, we filed the adversary complaint in September.

10   The defendants have not yet answered the complaint.  By

11   agreement, we've extended that answer date for some time.

12           The parties have engaged in some informal discovery

13   relating to the upcoming confirmation hearing.  That informal

14   discovery has been aimed at communicating to the defendants

15   what the aspects of our claim is, what the merits of our

16   claim are.  In connection with that informal discovery, there

17   has been a mutual document exchange by both parties.  We have

18   produced documents relating to these patents, relating to our

19   allegations.  They've produced documents back to us.  We have

20   some issues with the extent to which all the documents have

21   been produced to us, but I don't think now is the time or

22   place to discuss those.

23           We've also engaged in some expert discovery.

24   Rembrandt has provided to defendants an expert report from a

25   computer scientist expert who has analyzed the patents,

1    analyzed the DOCSIS standard, and has opined that the DOCSIS

2    standard infringes these four patents.  We provided that to

3    the debtors.

4        We've also provided an expert report from an expert

5    economist who has analyzed the revenues that these cable

6    modem services have generated for the debtors and has stated

7    a damages claim that he alleges -- he opines is the

8    appropriate damages remedy in this particular case.

9        THE COURT:  What kind of damages you looking for?

10       MR. GRINSTEIN:  We have alleged that, because of

11   this alleged infringement, in a hypothetical negotiation, the

12   defendants would have paid to us between a four and five-

13   percent royalty on cable modem services.  I think that ranges

14   -- ends up ranging from between ninety to $115 million.

15       I should say that we've filed the claim seeking $130

16   million as our administrative claim.  Since we've done some

17   more refined analysis, after having engaged in a little bit

18   of discovery and having talked back and forth with the

19   defendants, we've now since refined that claim to the outside

20   of the claim is I believe $115 million.  Ninety-two to one

21   fifteen.  Excuse me.

22       THE COURT:  Okay.  Now, I take it against the

23   Adelphia alleged infringers, at least, you're not looking for

24   injunctive relief?

25       MR. GRINSTEIN:  We are not looking for injunctive

Argument - Grinstein                              12

1   relief, Your Honor.  And I should say --

2          THE COURT:  You're looking for injunctive relief

3   against the other defendants in your other lawsuits?

4          MR. GRINSTEIN:  No, Your Honor.

5          I should also mention that we are continuing to

6   investigate infringement.  There may well be other aspects of

7   the debtors' products that infringe our patents.  We're

8   continuing to investigate that.  The stuff that we've stated

9   now is very preliminary in nature, so there may be other

10  services that the debtors do that we reserve our right to

11  allegations infringement against.

12         I stand somewhat corrected.  My colleague reminds me

13  we are looking for injunctive relief in other venues, for

14  example, against Time Warner.  If your question related to

15  any possible connection between Adelphia and anyone else

16  where there's injunctive relief, in the eastern district of

17  Texas we are looking for injunctive relief, but not in this

18  action.

19         THE COURT:  Where is that, in Plano?

20         MR. GRINSTEIN:  Excuse me?

21         THE COURT:  In Plano, Texas?

22         MR. GRINSTEIN:  No, the case is pending in Marshall,

23  Texas.

24         THE COURT:  Marshall?

25         MR. GRINSTEIN:  Marshall before Judge Ward.

1          THE COURT:  All right.  Now, do you have a view or

2   position on the advantages or disadvantages of coordinating

3   this litigation with the actions in the other jurisdictions

4   where similar or identical issues are being raised?

5          MR. GRINSTEIN:  I have not discussed that with the

6   other side.  I think if, you know, Your Honor wanted to

7   coordinate with Judge Ward and reach some sort of mutual

8   claim construction with Judge Ward on one of the aspects of

9   the patent cases to go through a procedure known as a

10  "Markman procedure" where the Court construes the claims of

11  patent.  That claim construction probably would be applicable

12  both to Time Warner and to Adelphia to a certain extent, so I

13  think it might be a good idea for you to coordinate with the

14  eastern district of Texas with respect to issues like that.

15  Frankly, we have not discussed that with the other side.

16         THE COURT:  Another option that's not infrequently

17  done in MDL litigation is to coordinate pretrial proceedings,

18  discovery and the like, and then to send the action back to

19  the district in which the underlying claim is pending.  Have

20  you thought about that?  Do you have a view on the

21  desirability or undesirability of that?

22         MR. GRINSTEIN:  I think that would be desirable,

23  Your Honor.  Candidly, the eastern district of Texas is a

24  very sophisticated patent venue.  I won't say most of the

25  patent cases that are getting filed today are filed in that

1    district, but a large percentage of them, so that district

2    has a lot of experience with patent matters.

3            Not to suggest that Your Honor doesn't, but if Your

4    Honor wanted to coordinate more closely with the eastern

5    district and sort of follow along on pretrial matters with

6    that district in the Time Warner case, I think that probably

7    would be advantageous to everyone involved.  The eastern

8    district has a very standardized and a very well-worn set of

9    pretrial patent procedures.  It's called the "local patent

10   rules" of that district.

11           THE COURT:  Is this the same court that was the

12   subject of The Wall Street Journal article --

13           MR. GRINSTEIN:  New York Times.

14           THE COURT:  -- about a lot of patent litigation

15   winding up in one particular district?

16           MR. GRINSTEIN:  Yes, Your Honor.  It was a New York

17   Times article.

18           THE COURT:  Oh, New York Times.  Okay.  All right.

19           Now, Mr. Grinstein, would either you or Mr. Garrity

20   comment on your perceived views as to the affect or non-

21   affect on pending reorganization matters in this court and

22   whether we can simply deal with this by creating a

23   satisfactory reserve or whether this involves more stuff and,

24   of course, what need I have to get this case decided under

25   any particular time frame?

Argument - Garrity                              15

1       MR. GARRITY:  Your Honor, Jim Garrity.

2       We have no objection to the establishment of a

3  reserve.  When we filed the complaint, we suggested that to

4  our adversary.  That then led to, understandably so, requests

5  for discovery and information about our claim, which we've

6  been happy to provide.  We don't want to stand in the way of

7  confirmation, Your Honor.  We'd like some money set aside to

8  address our claim once -- to pay the claim once the claim is

9  resolved on the merits, however that may be done, whenever

10  that may be done.

11       It's basically, Your Honor, from our perspective,

12  that simple.  We thought there might be an estimation

13  proceeding instituted, but we understand there won't be.  So,

14  Your Honor, we certainly will support any interim type of

15  solution that leaves us with assurance that once our claim is

16  finally allowed, as we believe it will be, that there will be

17  sufficient funds to pay it, as any other administrative

18  expense claim would have to be paid in the context of a

19  Chapter 11 case.  So I think that's the short answer, Your

20  Honor.

21       THE COURT:  All right.  Let me get the Adelphia

22  perspective.  Mr. Netzer?

23       MR. NETZER:  Very briefly, Your Honor, we're going

24  in reverse order here because, as I'm sure Your Honor

25  suspects, I'm not a patent lawyer, Mr. Meloro is.

Argument - Netzer                              16

1      But with respect to Your Honor's questions about

2  injunctive relief and also with respect to what, if anything,

3  needs to be done in the short term, what we haven't -- first,

4  both gentlemen were correct in saying there has been some

5  cooperative discovery.  That doesn't mean we have had all of

6  our questions answered, Your Honor, and here's a big one that

7  we asked right off the bat.

8      We've been sued for patent infringement during the

9  entire filing period, presumably, therefore, to the extent we

10  were infringing, we were infringing before.  That's more than

11  four years ago, Your Honor.

12      So we posed the question when we got the letter in

13  September of 2006, just months before confirmation hearing,

14  what was the date on which Rembrandt became aware of those

15  products and services, as well as the date on which Rembrandt

16  first had reason to believe that the products allegedly

17  infringed the patents in suit, and the reasons why Rembrandt

18  waited until September 13, 2006 to file its claims.  We have

19  had no answer to that question in discovery, Your Honor, and

20  I think it is a pertinent one.

21      As to the need for an estimation proceeding, what we

22  have said is that we are not -- still not yet in a position

23  to evaluate their claim for reserve of $130 million.  I think

24  that nothing proves that we were not in a position to

25  evaluate that than the fact that yesterday we learned that

1    Rembrandt hadn't evaluated it because it is no longer what

2    they're demanding.  And if we hadn't gotten the expert report

3    yesterday, we wouldn't know even that.

4            So I just wanted to give the context, Your Honor,

5    because, frankly, it's one troubling to us and pertinent, I

6    think, why it is that on the eve of confirmation, this came

7    up for the first time.  It's not as though Rembrandt is an

8    operating company.  All they do is buy patents and sue

9    people.  So --

10           THE COURT:  Wait.  Rembrandt was not the developer

11   of this technology?

12           MR. NETZER:  No, Your Honor.  I've learned an

13   interesting term that I hadn't heard before.  It's called

14   "patent trolls."  These are people --

15           THE COURT:  Patent what?

16           MR. NETZER:  Patent trolls.  Like in the Lord of the

17   Rings, trolls, t-r-o-l-l-s.

18           THE COURT:  Well, unfortunately, my boy isn't old

19   enough to read that stuff yet.  You mean t-r-o-l-l-s?

20           MR. NETZER:  Like under the bridge with the billy

21   goats, trolls.  They're people who don't actually develop

22   patents or technology, but just buy it up and don't have

23   operations, they just sue people.  I know Your Honor has

24   nothing in -- there's nothing in the Court's experience to

25   compare with people who just acquire interests in

1    litigations.

2         (Laughter.)

3              MR. NETZER:  But that is --

4              THE COURT:  Well, that's a very alien concept to me,

5    Mr. Netzer.

6              MR. NETZER:  That's why I thought I should

7    elaborate.

8              Your Honor, that's just by way of background.  I

9    leave to Mr. Meloro and Ms. Chapman the finer details of the

10   patent and the bankruptcy issues.

11             THE COURT:  Who's next for the Adelphia side?

12             MS. CHAPMAN:  Your Honor, Shelley Chapman from

13   Willkie Farr for Adelphia.

14             To just continue with what Mr. Netzer was saying,

15   the -- as Your Honor knows, the sale of the assets closed at

16   the end of July.  That's the end of the infringement period

17   that has been alleged because as of that moment we were no

18   longer an operating company and the assets moved to our

19   purchasers.

20             Notwithstanding that, this claim did not come in

21   until the occurrence of the administrative bar date in the JV

22   plan, so not to beat a dead horse, but there has been a lot

23   of waiting here and we find ourselves now, less than a month

24   before the commencement of the confirmation hearing, having

25   to deal with this allegedly 130-million-dollar claim.

Argument - Chapman                          19

1          Mr. Netzer is right.  As I understand it from Mr.

2   Meloro, we just received this expert report.  We'd like an

3   opportunity to analyze it and I think it would be our

4   intention to respond with an offer as to an appropriate

5   reserve, of course, believing and maintaining when we get to

6   that, that there is no infringement.

7          But as Your Honor knows in other reserve situations,

8   we have taken the approach of trying to come to a consensual

9   resolution without burdening the Court with a trial or even a

10  mini-trial on the merits.  We do have a time constraint here.

11  We have to deal with this in a way that does not stand in the

12  way of confirmation and that's what we're setting about doing

13  now.

14         What I would suggest is that -- and Mr. Meloro can

15  talk about timing -- is that we go that next round.  Maybe

16  there will be an agreement, maybe there won't.  If there

17  won't, we may, in fact, have to be back here for some sort of

18  a proceeding to estimate the claim.  We are --

19         THE COURT:  No, there -- I think I dealt with this

20  in the ABIZ decision, which I ultimately published a couple

21  years after I issued it.

22         MS. CHAPMAN:  Yes, Your Honor.

23         THE COURT:  My memory of that holding, and I'm a

24  little stale on it, is that it's pretty clear that I have the

25  ability to estimate, for purposes of establishing reserves,

1   even putting aside the issue of my ability to estimate for

2   allowance for all purposes.

3          MS. CHAPMAN:  That's correct, Your Honor.  We have

4   actually reviewed the decision recently in this context and

5   in the <u>ABIZ</u> case there was a slight nuance there because

6   there was a feasibility issue in the <u>ABIZ</u> case, so with that

7   caveat, yes.

8          In that case, Your Honor applied 502(c) and you

9   estimated the Adelphia claim against the ABIZ debtors for

10  reserve purposes, but not ultimate allowance purposes.  I

11  think in that case they ended up being one and the same, but

12  those facts I think are not applicable here.

13         So we know Your Honor is familiar with that

14  procedure.  That's like the procedure that we would go down.

15  We have not, frankly, thought through what the proceeding

16  here might look like, but given what's coming up with

17  confirmation, it would be our position that it would have to

18  be a fairly summary proceeding in nature.

19         I also have heard -- I view this as estimation and

20  reserve and I've heard the word "confirmation" used and I'd

21  be interested to hear whether, if a satisfactory reserve is

22  established, there are, nonetheless, confirmation issues or

23  whether we're done, because from our perspective, we'd like

24  to deal with Rembrandt, frankly, put it aside or have the

25  patent lawyers continue a pace to deal with it on the merits,

1    but we've got a plan to confirm and that's -- we don't want

2    to take our eye off that ball.

3          THE COURT:  As you properly observed, in <u>ABIZ</u>, if

4    the required reserve were too high, the ABIZ plan wouldn't

5    have been feasible.  I assume that in this case the plan,

6    whatever else people have complained about it, is feasible

7    under all scenarios and the only issue is how much has to be

8    held aside before stakeholders can get their recoveries.  Am

9    I correct?

10          MS. CHAPMAN:  That's exactly right, Your Honor.

11   There's a nuance, though, because a question might be asked,

12   given that we are feasible, that we do have the cash, why not

13   just do this, what's the down side.  We felt that it was --

14   would be inappropriate and inconsistent with our fiduciary

15   duty to simply agree to a number written on a piece of paper,

16   which was $130 million.  And, in fact, were you to set aside

17   that much money in cash, you would affect the mix of plan

18   consideration that goes to the subsidiary creditors, putting

19   aside how you would affect the parent company creditors.

20          It's not large.  I mean, in the case of this

21   magnitude, even $130 million isn't that large, but I think

22   even a one-or-two-percentage shift in the plan consideration

23   from the cash pot to the stock pot is of concern to us and,

24   therefore, we felt it was necessary to really look at this

25   very closely.

1            THE COURT:  Okay.  Mr. Garrity, to what extent do

2    you see any confirmation issues, other than the need to fix

3    the size of the reserve?

4            MR. GARRITY:  Your Honor, from our perspective, if

5    we get an acceptable reserve, we don't believe, from our

6    perspective, that there is a confirmation issue.  We

7    respectfully differ.  We think there is a significant

8    confirmation issue if there isn't a reserve, but we don't

9    have to even investigate that in the event that there is a

10   reserve.

11           And I will tell you, Your Honor, we have said from

12   the beginning that we are prepared to estimate this.  At the

13   outset of our discussions we were thinking about and

14   discussing in concept -- and understood, nobody made a

15   commitment, Your Honor -- we're going to estimate.  We were

16   then told, no, we're not going to estimate.  And now we're

17   being told we will estimate.

18           Your Honor, we would just like -- the perfect world

19   would be to agree upon a number, Your Honor, and we're happy,

20   willing, and hopefully able, to sit down and try to work that

21   out with the debtor.  Again, the last thing we want to do is

22   to be a fly in the ointment for this confirmation hearing.

23           Now, if we can't do that, most respectfully, Your

24   Honor, we would expect that there would be -- if there's

25   going to be an estimation hearing, let's decide that that's

Argument - Meloro                    23

1    what's going to happen, let's agree on a process and

2    procedure for doing it so that Your Honor can manage his

3    calendar for what may be, you know -- we're not close enough

4    to know, Your Honor, whether this is going to be protracted

5    or controversial, as far as the rest of the confirmation

6    goes.

7          We'd like to set some time out, subject to Your

8    Honor's calendar, and an agreement to move forward if that's

9    what they want to do.  But, Your Honor, as of last week,

10   that's not what they wanted to do.

11         So having said that, if we're able to work that out,

12   there is no confirmation issue.

13         THE COURT:  All right.  Anybody else want to be

14   heard on anything?  Mr. Meloro?  Did I pronounce your name

15   correctly?

16         MR. MELORO:  Yes.  Thank you, Your Honor.

17         I just wanted to -- since Mr. Grinstein spoke a

18   little bit about the patents, I thought it might be useful if

19   we shared a few thoughts that we had.

20         The plaintiff in the case, as you know, is an outfit

21   called Rembrandt Technologies.  These patents were purchased

22   in the early part of 2005 by Rembrandt.  The allegations of

23   infringement relate to cable modem technology.

24         The patents were purchased from a company called

25   Paradyne.  As best as we can tell, Paradyne had nothing to do

Argument - Meloro                            24

1   with cable modems.  As best we can tell, Paradyne had nothing

2   to do with the DOCSIS standards.  The DOCSIS standards were

3   put together by the leaders in the industry.  They apparently

4   all sat around a table, they attended meetings, they shared

5   ideas, and they came up with the standards on which all cable

6   modems -- essentially all cable modems operate.

7         As best we can tell, Paradyne never showed up at

8   those meetings.  They never came and said we have some useful

9   technology.  They never said we're a leader in this field.

10        Now maybe, while the leaders in the field were

11  adopting the standards, Paradyne was sitting there typing

12  Shakespeare and issuing patents exactly on those standards.

13  If they did, they never showed up, as best we can tell, to

14  come to the DOCSIS folks and say you're using our patents.

15  They never went to the cable operators, as best we can tell,

16  and said you're using our patents.  Never offered a license,

17  never threatened to sue anybody; they just did nothing, as

18  best we can tell.

19        Now, we've asked for -- we couldn't find any record

20  of communications with Adelphia from Paradyne or Rembrandt.

21  We asked for that; we haven't gotten anything.  We haven't

22  seen evidence that there was any extensive campaign to

23  license folks.

24        So what did Paradyne decide to do?  They were in the

25  modem business, they just weren't in the cable modem

1   business.  They decided to just sell their patents.  They

2   didn't want them anymore.  So they went out and they found

3   Rembrandt.

4          THE COURT:  Pause, Mr. Meloro.  Was Paradyne the

5   original filer of the patents with the patent office or are

6   you suggesting that Paradyne, like your allegation as to

7   Rembrandt, was kind of the patent equivalent to a claims

8   trader?

9          MR. MELORO:  Paradyne was an operating company.  At

10  one point it was a part of AT&T.  I believe that it was a

11  separate company that was bought by AT&T and then sold by

12  AT&T and became and independent company again.  We don't have

13  research-and-development records from Paradyne, but my

14  assumption is they were doing work in laboratories to develop

15  products, they just weren't doing work to develop cable

16  modems.  They were other products.

17         Paradyne eventually decided they had no need for the

18  patents and it found Rembrandt.  Rembrandt basically is a

19  pool of money and four lawyers, from what we can see from

20  their website.  They bought the patents, they bought a

21  seventy-three-percent interest in the patents for $1 million.

22  That's what Rembrandt paid for a pool of patents.

23         Early part of 2005 was the major transaction, as far

24  as we can tell, and when Rembrandt bought those patents, it

25  didn't contact Adelphia, as far as I know.  The infringement,

Argument - Meloro                           26

1   even the post-petition infringement, had been going on for

2   some time, if there's any infringement here.  And it's

3   interesting because a bunch of lawsuits were filed in Texas

4   against Comcast, Time Warner, Charter Communications, Cox,

5   Sharpe.  There may be others, but not for infringement of

6   these four patents.  The suits filed in Texas were for

7   infringement of four completely different patents that had

8   been bought by Rembrandt from Paradyne.

9         Supposedly those four patents are the four which

10  cover the DOCSIS standard.  A tactical choice was made not to

11  sue Adelphia at that point.  Why?  I don't know, but those

12  operators were sued under four different patents.

13        We got to what I understand is the last day for

14  filing administrative claims in this proceeding and on that

15  day Adelphia was sued for infringement of these four patents.

16  For some other tactical reason on that same day, Time Warner

17  and Time Warner alone was sued for infringement of these four

18  patents in Texas.

19        Mr. Grinstein I think said he wasn't sure if they

20  had yet gotten to every cable company.  They've gotten to

21  them all, but not on these patents.  We specifically asked

22  that question in one of our conference calls, is there anyone

23  other than Time Warner that has been sued, and we were told

24  no.

25        Now, the DOCSIS standard supposedly is the basis for

1    infringement, but the DOCSIS standard was developed without

2    any reference to anybody at Paradyne, as best we can tell at

3    this early stage.

4            Mr. Grinstein referred to three different

5    technologies that are involved with these patents.  The first

6    -- I don't know if I have them in exactly the same order.

7    The first that I have in my notes is the 761, which relates

8    to --

9            THE COURT:  Error correction?

10           MR. MELORO:  -- error correction.  Exactly.  This

11   patent has nothing to do with cable modems.  It was filed in

12   the era of dial-up modems and it was filed with reference to

13   the specific problems that you face with dial-up modems.  You

14   know, in those old days, you'd hear the call going through on

15   the dial-up modem and you'd hear these series of beeps and

16   sounds and then you'd have to wait, and you'd wait and you'd

17   wait and you'd hope that it would go through and sometimes it

18   wouldn't go through.  That was the problem that the 761 was

19   trying to solve.  It was trying to solve these slow,

20   cumbersome hookups from the old dial-up modems.

21           Cable modems operate on a completely different

22   principle.  The hookup is completely different.  The DOCSIS

23   standard doesn't use the protocols, doesn't use the

24   negotiation, doesn't use the sequence that's specified in

25   that patent.

1          There were two other patents, 159 and 234, that Your

2    Honor correctly characterized as relating to updating the

3    firmware.  And this relates to having some firmware remotely

4    in the cable modem and pushing some updates to the software

5    through the system.

6          Quite simply, there is absolutely nothing -- and

7    this patent is specific not to remotely updating the

8    software, but doing it in a very special way.  There's prior

9    art which relates to remotely updating software.  These

10   weren't the first folks to have the idea that you might want

11   to push software updates through communication systems.

12         And essentially, they got the patent by saying we

13   have a very narrow idea of how you can do it in what they

14   thought was an efficient way.  DOCSIS standard doesn't

15   require, and as best we can tell, nobody uses the firmware

16   update method that's in this patent.  You can update firmware

17   using DOCSIS-compliant modems, you just don't use what's in

18   this patent.  Paradyne never said anybody did.  Quite

19   frankly, Rembrandt didn't until quite recently.

20         The last patent is the 444 patent and the 444 patent

21   relates to the actual data that gets transmitted through the

22   system.  And there's a preamble that goes on the data.  If

23   you want to send some command from your computer back to the

24   internet, when it goes through your cable modem, they tack on

25   a header, essentially, a preamble.  And the patent relates --

1          THE COURT:  Ahead of the block of data?

2          MR. MELORO:  Exactly.  And there's also something on

3   the tail end as well, but the patent really relates to what's

4   on that preamble on the front end before what they call the

5   "payload" comes through with the data that's being

6   transmitted.

7          And the patent relates to two aspects of that

8   preamble.  One is how you encode the information to make the

9   transmission more efficient, and the second is what

10  information is in that preamble.

11         Now, this patent, I have to say, we have progressed.

12  This was the last of the patents that were filed by Paradyne

13  and it was filed originally in 1999, so this was not a dial-

14  up modem patent, but it also wasn't a cable modem patent, it

15  was a DSL patent.  DSL is what you get from Verizon as

16  opposed to what you get from your cable company; faster than

17  dial-up but completely different technology.

18         And in fact, what was specified in the patent is a

19  preamble that's used for DSL technology.  The information

20  that goes in there is not information that goes into a DOCSIS

21  preamble.  We're still at an early stage, we're moving at

22  lightening pace by the standards of most complex infringement

23  cases, we're still learning a lot, but the technology that's

24  in these patents -- if you assume they're worth anything,

25  even if you assume they're worth the million dollars that

1 │ they paid for them, it's just simply not the technology

2 │ that's used in cable modems.

3 │     THE COURT:  Okay.  Obviously, I'm not going to be

4 │ making any judgments onto the merits either for estimation

5 │ purposes or more extensive purposes today.  I think we simply

6 │ need to develop a game plan for dealing with the triaging of

7 │ our priorities in terms of getting things done.

8 │     Subject to your right to be heard, it seems to me

9 │ that I should set a period of time, not particularly lengthy,

10 │ but a period of time for you folks to agree upon a consensual

11 │ reserve, if one can be achieved.

12 │     I must say, hearing the seemingly dramatic

13 │ differences in views as to the merits, I have a sense that

14 │ Adelphia might well come to the view that the reserve should

15 │ be very modest.  And if that's true, you may have to agree to

16 │ disagree on that.

17 │     And although the reserve would only be for purposes

18 │ of reserve and not for the purpose of ultimate liability, I

19 │ don't know if Rembrandt is going to care about the cosmetic

20 │ or other implications of a reserve that's so small that seems

21 │ to suggest that at least somebody thinks its claims aren't

22 │ worth a whole lot.

23 │     I want to get your views on my tentative,

24 │ nevertheless, that I should give you folks a period of time

25 │ to see if you can reach a consensual reserve, and then what

1   we need to do, if you agree to disagree, and what we need to

2   do if I have to have an estimation proceeding, it seems to me

3   that since -- and again, this is subject to your rights to be

4   heard, but it seems to me that if Adelphia has the

5   wherewithal to post a reserve at any place along the spectrum

6   of the amount demanded by Rembrandt, we're still not talking

7   about feasibility; and that if you've got to pay your admin

8   claims or reserve for them on the effective date, we may be

9   shooting for the effective date of the plan, rather than the

10  confirmation hearing, but I want both sides to comment on

11  that, so whichever side wants to be heard first.  Ms.

12  Chapman?

13         MS. CHAPMAN:  Your Honor, I think the outside date

14  is the effective date of the plan, however, I think if we

15  have to agree to disagree, I wouldn't want to put the

16  occurrence of the effective date at any risk, would want it

17  to occur as soon as possible after confirmation; and

18  therefore, I would like to be more aggressive on behalf of

19  the debtors with respect to the timetable and perhaps have

20  Your Honor allocate -- the parties have not discussed what a

21  proceeding would look like.  I don't think that we would be

22  looking at more than a day at the most.  I know these are

23  extremely complex issues that I don't purport to begin to

24  understand, but we have parameters that we have to operate

25  under here.

1          So I think that the more prudent course for the

2    debtors to insure that if we do get through confirmation

3    successfully, as I hope and anticipate we will, that this

4    will not be hanging out there.  So I'd rather that we be

5    prepared to proceed sooner rather than later.

6          I have to defer to Mr. Meloro as to timing since we

7    just got the expert report and I don't know how quickly our

8    team will be in a position to respond to the new damage range

9    that we just became aware of, but I'd rather keep the focus

10   on confirmation and prior to the end of confirmation, rather

11   than have it slip until sometime before the effective date.

12   But the effective date, you're correct, that's the drop-dead

13   date by which all reserves have to be set.

14         THE COURT:  Now, with that said, we have a pretty

15   full December on matters wholly apart from this patent

16   controversy.  How much time, Ms. Chapman, Mr. Meloro, do you

17   folks think you need to have the dialogue with Rembrandt as

18   to the consensual reserve, if a consensual number can be

19   reached?

20         MR. MELORO:  Your Honor, we had discussed, before we

21   got the expert reports yesterday, a schedule for exchanging

22   contentions and under that schedule, we would respond to the

23   contentions we got yesterday by a week from tomorrow, the day

24   before Thanksgiving.  Things have changed dramatically in

25   terms of what they're saying, but we would still hope to keep

Pretrial Conference                              33

1  to that schedule to work with our experts, to understand what

2  they've said, to see where we agree or disagree, and it would

3  seem to me that we would be in a position starting right

4  after Thanksgiving to have a dialogue with them, once we had

5  digested it and responded to what they've said.

6        THE COURT:  Mr. Garrity or Mr. Grinstein?

7        MR. GARRITY:  Your Honor, from the perspective of if

8  there's going to be an estimation, I guess from our

9  perspective, certainly the effective date, from our

10  perspective, would be the outside.  We don't -- the way the

11  plan is drafted, Your Honor, administrative claims are going

12  to be filed -- potentially filed forty days after the

13  effective date, so we've got a real question as to how that's

14  going to work.

15        But again, from our perspective in dealing with our

16  claim, if we can get an agreed reserve, of course we want to

17  do that, and if we have to estimate it in the context of the

18  confirmation hearing, you know, so be it.  And, you know, we

19  will try to work out an agreement with regard to the evidence

20  and how to put the evidence in, et cetera.  I suppose we

21  could use your earlier work in the case you mentioned

22  earlier.  Forgive me, Your Honor, I can't remember the name.

23        THE COURT:  It's <u>Adelphia Business Solutions</u>.  It's

24  nickname is <u>ABIZ</u>.

25        MR. GARRITY:  Right.  So let me defer to Mr.

1    Grinstein with regard to the issues on the merit claim.

2              MR. GRINSTEIN:  I understand Your Honor doesn't want

3    to get into a debate about the merits, so I'll put aside --

4              THE COURT:  I assume that everything I heard from

5    Mr. Meloro you essentially disagree with.

6              MR. GRINSTEIN:  That's correct, Your Honor.  And I

7    don't think now is the time or the place to state that.

8              I will say --

9              THE COURT:  With one exception, Mr. Grinstein.  Do

10   you quarrel with their assertion that you guys didn't develop

11   the technology and that you acquired it and that, therefore,

12   to the extent that the real developers of the technology have

13   information relevant to this controversy, we're going to have

14   to get that from them as third-party witnesses?

15             MR. GRINSTEIN:  I think, as I mentioned in my

16   opening presentation, absolutely we acquired these patents

17   from Paradyne.  Paradyne is the one who filed for those

18   patents and developed them.  We acquired them subsequent to

19   that.

20             As far as the location of documents, in the course

21   of our dealings with Paradyne to acquire these patents,

22   Paradyne provided us a lot of due diligence from its own

23   files about those patents and that information we've already

24   provided to the other side.  There is some degree of

25   information which I imagine Paradyne didn't provide to us,

1   and in that situation, we're trying to work cooperatively

2   with Paradyne to get that information from them to give to

3   the other side.  There might possibly be some third-party

4   discovery.  I'm sure, to protect itself, the defendants will

5   want to engage in that, but there will be some sort of

6   process of acquiring third-party discovery, some of which

7   they've already got; I'm sure there's some more they need to

8   get.

9           As regard to the hearing that we're talking about,

10  though, I will mention that the parties have negotiated a

11  stipulation that governs the exchange of information relating

12  to the claim, which was intended to be a stipulation that

13  governs the exchange of information, were we to get to some

14  sort of contested hearing in a few weeks about what to

15  reserve for the claim.

16          Pursuant to that stipulation, we were, yesterday, to

17  provide an expert opinion to them relating to damages and

18  relating to infringement.  They were to have provided to us

19  an expert opinion where they stated forth their opinions that

20  the patents were somehow invalid.  We provided those expert

21  opinions to them, they did not provide to us.

22          I assume we are still going forward on the basis of

23  that stipulation and that stipulation will govern the manner

24  by which we'll put discovery or put evidence in at the

25  hearing; which is to say, I would hope by having not provided

1   their invalidity report to us yesterday, they're not going to

2   take some position that they can provide one at some future

3   date and then put in invalidity evidence at the hearing in an

4   effort to suggest to Your Honor that the patents are invalid

5   and, therefore, a reserve of zero is appropriate.

6           THE COURT:  Well, I'm not a patent lawyer, never

7   was, but it seems to me that some of the points that Mr.

8   Meloro was making could seemingly be related to contentions

9   that part or all of your patents are invalid.

10          MR. GRINSTEIN:  And we had an agreement, Your Honor,

11  that they were to provide an expert opinion on that yesterday

12  and they did not.  They may well think that they don't need

13  an expert opinion or whatnot, but I just want to make clear

14  that we have an agreement on how to proceed forward and how

15  to exchange discovery and that agreement is aimed towards

16  putting forth a presentation at the time of the hearing, the

17  estimation hearing for the time of the claim.  It's not

18  related to the adversary, really.  We weren't gauging all of

19  this discovery right now focused on this estimation

20  proceeding.  They haven't even answered the adversary yet, so

21  there has been no formal adversary discovery.

22          And so, to the extent that we are not able to reach

23  consensus with respect to the amount of the claim, I just

24  thought it important to point out to you, Your Honor, that we

25  have reached consensus on how to proceed forward in discovery

1  towards the estimation hearing and, you know, Rembrandt

2  intends to live by that particular arrangement.

3          THE COURT:  Okay.  Mr. Meloro?

4          MR. MELORO:  Yes, we do have an agreement with

5  counsel on the exchange of expert reports.  We chose not to

6  submit an invalidity expert report.  We don't intend to

7  present that evidence if there's a hearing some day.

8          THE COURT:  You say you do or you don't?

9          MR. MELORO:  We do not.  Our contention, our main

10  contention, and the contention we're going to put through

11  experts, is that we don't use the technology, we don't

12  infringe on the patents.

13          THE COURT:  So assuming the patents are fully valid,

14  you still don't owe them anything?

15          MR. MELORO:  Correct.  Now, there is one avenue of

16  invalidity that we don't think we need an expert report on

17  and we don't -- and we haven't submitted an expert report on

18  and it relates to some documents that are in their files that

19  we believe creates at least a strong inference that there is

20  a problem with this product having been released by Paradyne

21  too early.  And it results in invalidity not on the basis of

22  the work of others, but on the basis of Paradyne's own

23  behavior and actions.

24          We don't think we need an expert report on that, we

25  don't intend to offer expert testimony on that.  We've asked

Pretrial Conference                                         38

1    counsel for additional documents and information on this

2    issue.  We haven't gotten any yet, so we're not quite sure

3    what, if anything, we're going to do with regard to that

4    issue if there is a hearing some day, but we do intend to

5    stay within the confines of our agreement that if you have a

6    hearing and you're going to offer expert testimony, it's

7    going to be by virtue of the subjects identified in the

8    expert reports.

9          THE COURT:  Okay.  Now, clarify one thing for me,

10   and I need to get an answer on this from Mr. Grinstein as

11   well.  Is the deal that you folks made on exchanges of

12   informal discovery and expert reports and the like, was that

13   intended to do double duty for the merits and any estimation

14   proceeding or was it for only one or the other?

15         MR. MELORO:  It was only as a preliminary matter for

16   an estimation or whatever bankruptcy-related proceeding might

17   need to occur.  It was not intended to be for the merits of

18   the case as a whole.  I think we both envision a subsequent

19   full discovery period with expert reports following on later

20   on.

21         THE COURT:  Okay.  Mr. Netzer was rising.  I don't

22   know if he wanted to talk to you or me.

23         MR. NETZER:  To you, Your Honor.

24         Just also to say that in addition -- not that this

25   is unrelated to estimation.  We needed, of course, to

1   evaluate their demand for a reserve and requested the

2   information for that purpose.  The only other refinement I'd

3   offer to what's said is while, yes, there is an agreement

4   about discovery, I think that -- and I'm not sure if you

5   meant to imply this, Mr. Grinstein, that that is not

6   necessarily the exclusive discovery that any party can take

7   between now and -- at any time.

8         THE COURT:  Okay.  Mr. Grinstein, do you agree or

9   disagree with what we just heard from Mr. Meloro and Mr.

10  Netzer?

11        MR. GRINSTEIN:  Well, with respect to Mr. Meloro, I

12  agree that the expert reports that we're putting forth right

13  now are not intended to do double duty.  Typically you do

14  expert discovery long after fact discovery has concluded and

15  there really has been no fact discovery, so these are

16  preliminary reports.

17        I will -- I think Mr. Meloro will agree that we've

18  exchanged a lot of documents which won't need to be re-

19  exchanged, of course.

20        As far as what Mr. Netzer indicated, I think our

21  agreement was pretty clear about what scope of discovery

22  we're agreeing to for purposes of the hearing.  I certainly

23  don't think we've, you know, limited ourselves with respect

24  to the adversary proceeding, but there is a scope of

25  discovery we've agreed to with respect to the hearing; for

1    example, we've said that no party will take deposition of

2    parties or non-parties, and so I would imagine that does

3    preclude a pretty large chunk of potential discovery between

4    now and the hearing.

5         THE COURT:  Okay.  How was the agreement papered, by

6    a letter agreement or a stip, and a stip that was going to be

7    so ordered or was just between the parties or what?

8         MR. GRINSTEIN:  We've negotiated a stipulation and

9    agreed to its terms and we were intending to file it as soon

10   as we can get signatures on it.  I think we're all in

11   agreement on that stipulation.

12        THE COURT:  Okay.  Anything else, anybody?

13        All right.  Well, here's what we're going to do.  I

14   share your view that the full litigation of the adversary and

15   the merits of the underlying controversy will need to play

16   out in due course and what we need to do now is keep our eye

17   on the ball of what we need to do in the short range.

18        I haven't heard any objection to Ms. Chapman's

19   proposal that we do a stop, look, and listen around

20   Thanksgiving for the purpose of seeing whether there's a

21   consensual agreement as to the size of an appropriate

22   reserve, but I don't know whether I'm being unduly

23   pessimistic, but I think we need to make arrangements for

24   what happens if there isn't an agreement.

25        And for that reason, then, we have to figure out

1    when we're going to be doing this and whether it's your

2    expectation that you guys are going to try all of this before

3    Christmas and then you're just going to look to me to work

4    over Christmas and over the Christmas holiday to give you the

5    answers you want.

6              By my understanding, and I'm going to need help from

7    the Adelphia folks on this, we have now reserved Thursday the

8    7th, Friday the 8th, and Thursday the 14th and Friday the

9    15th for all of the Adelphia confirmation issues that I knew

10   about back at the time, which did not include this one; that

11   I also have a day reserved for some kind of Adelphia purposes

12   on Tuesday the 12th; and that I now have an open day on

13   Monday the 11th, which was going to be used as an emergency

14   contingency day.

15             With all of that said, I don't know, given the most

16   recent update on the acrimony in the Adelphia case as to the

17   extent to which even that is going to be enough, and I want

18   to give you from Adelphia, if you can provide them, as to

19   when and how I should try to schedule this.

20             MS. CHAPMAN:  Your Honor, if I'm understanding

21   correctly, based on what is happening with the confirmation

22   you now assume that you're going to be having confirmation

23   proceedings on the 11th, the 12th, the 14th and the 15th?

24             THE COURT:  Well, the 7th, the 8th, the 14th and

25   15th.  The 12th is what we call an "Adelphia day," which you

1   can use in some fashion; and the 11th has not been given to

2   anybody else because I was afraid that even that isn't --

3   what I've already reserved isn't enough.  Or reserved not in

4   the sense of reserves like we're talking about here today,

5   but saved for use for Adelphia needs.

6           I do have to tell you that I have another ninety or

7   a hundred Chapter 11 cases.

8           MS. CHAPMAN:  Yes, we tend to forget that, Your

9   Honor, but I am aware of that.

10          I guess the only suggestion that I could make is

11  that we be given time on the 11th and, at the risk of putting

12  undue pressure on the patent attorneys, if there were any

13  time prior to the 7th and the 8th, I believe that once we get

14  into the thick of confirmation, that's going to have to

15  assume a priority and we don't want to put Your Honor in a

16  position to have to be laboring over a patent liability

17  and/or damages opinion in the midst of that.

18          THE COURT:  Well, time out, Ms. Chapman.  If you

19  guys are looking for anything other than an estimation

20  decision before the effective date of a plan, assuming it's

21  otherwise confirmed, I think that would be unrealistic as

22  well.

23          MS. CHAPMAN:  I'm sorry, Your Honor.  I didn't

24  understand what you just said.

25          THE COURT:  The most that we're going to be talking

1   about between now and the effective date of any plan,

2   assuming, especially in the absence of people who have

3   different views of the world than you and the Creditors'

4   Committee, that the plan is confirmed, the most we're going

5   to have is a determination of the reserve --

6           MS. CHAPMAN:  Yes, Your Honor.

7           THE COURT:  -- before the effective date.

8           MS. CHAPMAN:  Yes.

9           THE COURT:  Okay.

10          MS. CHAPMAN:  That's all that we are contemplating.

11  That's all that we believe is necessary in order to move

12  forward.

13          THE COURT:  All right, then.

14          MR. GARRITY:  Your Honor, pardon me.

15          THE COURT:  Yes, Mr. Garrity?

16          MR. GARRITY:  I apologize for interrupting you.

17  Just a question.  On the reserve, Your Honor -- are you

18  contemplating the fixing of a reserve for the Rembrandt

19  claim, not a larger reserve for all administrative claims?  I

20  had understood it to be the former, the Rembrandt claim.

21          THE COURT:  I did as well.  It's my understanding

22  that the only reserves that I'm going to need to set in this

23  case are those where the reserves would be sufficiently

24  material so it has an effect upon creditor distributions and

25  that most of them have been consensually resolved and maybe

1  there will be a few that I will have to do similar

2  proceedings on, but I haven't been told of any such yet.

3        MR. GARRITY:  Thank you, Your Honor.

4        THE COURT:  Ms. Chapman, am I right in that

5  understanding?

6        MS. CHAPMAN:  Well, Your Honor, this is a unique

7  situation.  When we've been here before you on reserves, they

8  have been unsecured claims in different classes in the

9  capital structure.  This is an administrative claim.

10       THE COURT:  All pre-petition unsecured claims.

11       MS. CHAPMAN:  Correct.  That's right, Your Honor.

12  So this is an administrative claim.  It's a horse of a

13  different color and if I hear Mr. Garrity correctly, what I

14  think they're asking for is their very own reserve with their

15  name on it, not a piece of a reserve that builds up generally

16  to a reserve for all admin claims similarly situated.  I

17  believe that's what they're asking for.

18       MR. GARRITY:  Your Honor, that's exactly what we're

19  asking for, and the reason we need it, Your Honor, is because

20  in their plan there is an ability for people to file

21  administrative priority claims after the effective date.

22       Now, if we don't know that there are funds available

23  to pay us, then we don't know that the plan is going to be

24  feasible.  And most respectfully, I don't know how anybody

25  could find that it's feasible.

Pretrial Conference                    45

1          But in any event, Your Honor, that's what we want.

2   That's what we contemplate, that's what we would ask for, and

3   once we got it, that would most likely obviate and deal with

4   whatever confirmation issue we had.

5          THE COURT:  All right.  Here's what we're going to

6   do.

7          I'm going to give you Monday the 11th -- no, strike

8   that -- Tuesday the 12th for a hearing on the estimation for

9   purposes of reserves, if that is necessary; and the 11th,

10  which was empty and which was going to be used as an Adelphia

11  day will be used for confirmation continuation so we have a

12  three-day consecutive period of proceedings on the

13  confirmation hearing.

14         Then we'll have a two-day break, during which, on

15  the 12th I'm going to deal with the issues in this matter and

16  on the 13th I'm going to deal with all my other cases, and

17  then we'll resume -- or as many of my other cases as I can

18  squeeze into the 13th, and then on the 14th and 15th we'll be

19  back to Adelphia confirmation.

20         So you folks are going to have, if you can't agree,

21  a hearing that will run on the 12th.  Usual case management

22  order procedures are going to prevail, specifically taking

23  all direct, by affidavit or declaration, and only cross and

24  subsequent testimony going in live, getting documents to me

25  in advance so that I can review them in advance, but to the

1    extent that people have evidentiary objections to anything

2    that will be going in by paper, you're letting me know in

3    advance so that I can at least read them with the

4    understanding that there is an evidentiary issue.

5         And I will deal with procedural matters and/or

6    motions in limine and/or evidentiary objections to the extent

7    already known at some date before the 12th, like perhaps the

8    4th or the 5th of December.

9         Thanksgiving is the 23rd and the 24th.  I'd like you

10   to let me know by Wednesday the 29th as to whether or not you

11   have a consensual agreement on the size of the reserve

12   because I'm going to need the time if you do.  And if you

13   don't, I'm going to have to figure out whether the amount of

14   time I've allocated is sufficient.

15        And I think that's about as far as we can get today.

16   Are there open issues, Mr. Garrity?

17        MR. GARRITY:  Just a question, Your Honor.  As far

18   as communicating with the Court on the 29th, just by letter?

19   Is that sufficient?

20        THE COURT:  Letter copied to your opponent.

21        MR. GARRITY:  Of course.

22        THE COURT:  If it's a deal, I assume you can do

23   something that you vetted in advance.

24        MR. GARRITY:  Yes.

25        THE COURT:  If it's not, one way or another just

1  tell me.

2          MR. GARRITY:  Thank you.

3          THE COURT:  Oh, one other thing.  To what extent

4  does this involve anything that is commercially proprietary

5  or sensitive?  Can I hold all these hearings in the clear?  I

6  assume if you're talking about a patent, by definition a

7  patent is a public document, it's not a trade secret.  And

8  Adelphia isn't in the business anymore, so Adelphia doesn't

9  care.  Am I correct?

10         MR. MELORO:  We don't see any reason why this can't

11 be held in open court, Your Honor.

12         THE COURT:  Mr. Garrity?

13         MR. GARRITY:  We agree, Your Honor, it can be held

14 in open court.

15         THE COURT:  Okay.  Okay.  All right.  Anything else,

16 anybody?  All right.  Thank you, folks.  Have a good day.

17     (Proceedings concluded at 10:43 a.m.)

18                              *****

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct transcript

3      from the electronic sound recording of the proceedings in the

4      above-entitled matter to the best of my knowledge and

5      ability.

6

7

8                   *Lisa Luciano*

9
    _____            November 15, 2006
10   Lisa Luciano, AAERT Cert. No. 327
     Certified Court Transcriptionist
11   For Rand Transcript Service, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>Exhibit D</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re Adelphia Communications Corporation, <u>et al.</u>, | ) ) ) | Chapter 11 <br> Case No. 02-41729 (REG) |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| Rembrandt Technologies, LP, | ) ) | |
| Plaintiff, | ) ) | Adversary Proceeding |
| v. | ) ) ) | No. 06-01739 (REG) |
| Adelphia Communications Corporation; <br> Century-TCI California, LP; <br> Century-TCI California Communications, LP; <br> Century-TCI Distribution Company, LLC; <br> Century-TCI Holdings, LLC; <br> Parnassos, LP; <br> Parnassos Communications, LP; <br> Parnassos Distribution Company I, LLC; <br> Parnassos Distribution Company II, LLC; <br> Parnassos Holdings, LLC; <br> Western NY Cablevision, LP | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | | |

## <u>Stipulation</u>

Plaintiff Rembrandt Technologies, LP (Rembrandt) has asserted post-petition patent infringement claims against Debtor Adelphia Communications Corporation (Adelphia) and JV Debtors Century-TCI California, LP, Century-TCI California Communications, LP, Century-TCI Distribution Company, LLC, Century-TCI Holdings, LLC, Parnassos, LP, Parnassos Communications, LP, Parnassos Distribution Company I, LLC, Parnassos Distribution Company II, LLC, Parnassos Holdings, LLC, Western NY Cablevision, LP (collectively, JV Debtors) alleging that the provision of internet broadband services of Adelphia and the JV Debtors infringe four of Rembrandt's patents.  Adelphia and the JV Debtors contend that they lack

sufficient information about the claims to be able to establish a reserve for these administrative claims. The parties have agreed to engage in limited discovery according to the calendar set forth below in an attempt to reach agreement on the proper amount, if any, to reserve for these claims prior to the plan confirmation hearing currently scheduled to begin December 7, 2006.

Accordingly, IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned attorneys for the parties herein, that limited discovery shall take place according to the calendar set forth below:

| DISCOVERY | DATE |
|---|---|
| Parties exchange limited document requests and requests for information. | October 20, 2006 |
| Rembrandt's response to Adelphia's October 20 question regarding its damages claim | October 27, 2006 |
| Rembrandt's response to Adelphia's October 20 questions regarding its infringement contentions | November 3, 2006 |
| Written objections to document requests and good faith production of documents responsive to October 20th requests, as indicated in the parties' telephone conferences of October 23 and 24, and production of all documents to be relied upon in initial expert reports. Supplementation of document production shall be permitted for documents later identified. | November 3, 2006 |
| Disclosure of initial expert reports, Rembrandt to provide reports on infringement and damages, Adelphia to provide a report on its invalidity contentions. | November 13, 2006 |
| Disclosure of rebuttal expert reports. | November 22, 2006 |

The parties agree that they will not seek depositions of party or non-party witnesses prior to the conclusion of the plan confirmation hearings, absent agreement of the other party or order of the Court. Subpoenas duces tecum for production of documents may be served on third parties and depositions on written questions of these third parties solely for the authentication of

3480754

documents. Such subpoenas will be governed by the Federal Rules, and no party consents to the propriety of any particular subpoena by virtue of this stipulation..

Finally, both parties anticipate production of documents containing confidential, proprietary information, including trade secrets. Some documents produced by the parties may contain trade secrets belonging to third-parties, which the parties to this case are legally obliged to take steps to protect. The parties may also subpoena confidential documents directly from non-parties. To protect the confidentiality and business value of the information contained in these documents, the parties move the Court to enter the proposed protective order submitted with this stipulated motion. This protective order is intended to address the confidentiality of documents and information produced during this phase of the case. Subsequent to the plan confirmation the parties may request modifications to this protective order to accommodate additional discovery contemplated at that time.

RESPECTFULLY SUBMITTED

Dated: November 15, 2006.

WILLKIE FARR & GALLAGHER, LLP          SUSMAN GODFREY L.L.P.

By: /s/ Roger Netzer _____          By: ___ /s/ Vineet Bhatia _____
ROGER NETZER (RN-7190)                 VINEET BHATIA (VB 9964)
787 Seventh Avenue                     MAX L. TRIBBLE, JR.
New York, NY 10019-6009                Texas Bar 20213950 (*application pending*)
Tel: (212) 728-8000                    EDGAR SARGENT
                                       Washington Bar 28283 (*application pending*)

Attorneys for Defendants and
Debtors in Possession

Adelphia Communications Corporation;
Century-TCI California, LP;
Century-TCI California Communications
LP; Century-TCI Distribution Company,
LLC; Century-TCI Holdings, LLC;
Parnassos, LP; Parnasos Communications,
LP; Parnassos Distribution Company I,
LLC; Parnassos Distribution Company II,
LLC; Parnassos Holdings, LLC;
Western NY Cablevision, LP

BROOKE A.M. TAYLOR
Washington Bar 33190 (*application pending*)

TIBOR L. NAGY
Texas Bar 24041562 (*application pending*)

SUSMAN GODFREY L.L.P.
590 Madison Ave., 8th Floor
New York, NY 10022
Main Telephone: (212) 336-8330
Main Fax: (212) 336-8340
Email: vbhatia@susmangodfrey.com
Email: mtribble@susmangodfrey.com
Email: esargent@susmangodfrey.com
Email: btaylor@susmangodfrey.com
Email: tnagy@susmangodfrey.com

JAMES L. GARRITY, JR. (JG 8389)
MARC B. HANKIN (MH 7001)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Main Telephone: (212) 848 4000
Main Fax: (212) 848 7179
Email: jgarrity@shearman.com
Email: MHankin@Shearman.com

SO ORDERED

**S/ Robert E. Gerber   11/20/2006**
Robert E. Gerber, United States Bankruptcy Judge

**Exhibit E**

**Hearing Date and Time:  December 7, 2006 at 9:45 a.m.**

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179
James L. Garrity, Jr. (JG-8389)
Marc B. Hankin (MH-7001)

Co-Counsel to Rembrandt Technologies, LP

SUSMAN GODFREY L.L.P.
590 Madison Ave., 8th Floor
New York, NY  10022
Telephone:  (212) 336-8330
Fax:  (212) 336-8340
Vineet Bhatia (VB-9964)
Max L. Tribble, Jr. (*Pro Hac Vice*)
Edgar Sargent (*Pro Hac Vice*)
Joseph S. Grinstein (*Pro Hac Vice*)
Brooke A.M. Taylor (*Pro Hac Vice*)
Tibor L. Nagy (*Pro Hac Vice*)

Co-Counsel to Rembrandt Technologies, LP

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:     **Chapter 11**
:
**In re:**        :     **Case No.  02 – 41729 (REG)**
:
**ADELPHIA COMMUNICATIONS** :     **(Jointly Administered)**
**CORPORATION.,** *et al.,*     :
:
       **Debtors.**     :
:
:
-------------------------------------------------------------x

**OBJECTION OF REMBRANDT TECHNOLOGIES, LP TO**
**CONFIRMATION OF THE FIFTH AMENDED JOINT CHAPTER 11**
**PLAN FOR ADELPHIA COMMUNICATIONS CORPORATION AND**
**CERTAIN OF ITS AFFILIATED DEBTORS**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

        Rembrandt Technologies, LP ("Rembrandt"), the holder of an asserted administrative expense claim arising from the post-petition patent infringement by Adelphia Communications Corporation ("Adelphia") and certain of its subsidiaries and affiliates, as and for its objection (this "Objection") to the confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors (the "Plan"),[1] respectfully represents as follows:

## **Preliminary Statement**

        1.      The Plan calls for the determination of the amount of cash withheld for payment of Allowed Administrative Claims and not distributed to pre-petition unsecured creditors to be made as of the Effective Date, well before the bar date for Administrative Claims. Once the aforementioned Effective Date determination is made, there is no other source of funds to satisfy Administrative Claims. Accordingly, the Plan is not confirmable because – in violation of black letter law – it fails to provide the means for the Plan Administrator to pay all Allowed Administrative Claims in full.

        2.      As such, the Plan improperly subjects holders of disputed Administrative Claims (whenever timely filed) to the risk that the funds held for payment of Administrative Claims will be exhausted prior to such claims being Allowed. As a result of this risk – resulting from a basic flaw in the Plan's structure – the Plan violates the Bankruptcy Code's requirement that all administrative claims be paid in full and in cash, and that a plan of reorganization provide the means for a debtor to satisfy such claims. For the reasons described below, Rembrandt objects to confirmation of the Plan, unless the Debtors modify the Plan to provide for a cash

---

[1]      Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

reserve that will be used solely to satisfy the Rembrandt Administrative Claim upon such claim becoming an Allowed Claim.

## Background

3.      On June 10, 2002, Century Communications Corp., an Adelphia subsidiary, filed a voluntary petition for relief under Bankruptcy Code.  Thereafter, commencing on June 25, 2002, and continuing periodically thereafter, Adelphia and substantially all of its subsidiaries filed voluntary petitions under chapter 11 of the Bankruptcy Code.

4.      Since seeking bankruptcy protection, Adelphia and its affiliates continued to provide cable internet and television services (collectively, the "Post-Petition Services") to consumers throughout the United States until the sale of substantially all of their assets on July 31, 2006, to Time Warner Cable and Comcast.

5.      In connection with the Post-Petition Services, Adelphia and certain of its subsidiaries and affiliates engaged in post-petition infringement of certain of Rembrandt's patents, as alleged in the complaint filed with this Court on September 13, 2006 (the "Complaint," attached hereto as Exhibit A).  Also on September 13, 2006, Rembrandt filed a corresponding proof of administrative claim (the "Proof of Administrative Claim," attached hereto as Exhibit B).[2]  In the Proof of Administrative Claim, Rembrandt asserted that the administrative expense claim arising from the post-petition patent infringement was in an amount of not less than $130.3 million (the "Rembrandt Administrative Claim").  In light of subsequent analysis of the Debtors' infringement, Rembrandt has determined that the amount of the Rembrandt Administrative Claim is approximately $92 million to $115 million, depending on the reasonable royalty rate the Court determines is appropriate in this case.  Royalty rates in patent infringement actions are typically governed by a fact-intensive hypothetical negotiation

---

[2]      As the exhibits to the Proof of Claim are the Complaint and its exhibits, the exhibits to the Proof of Claim are not attached hereto.

analysis involving what are known as the *Georgia-Pacific* factors. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971). As set forth in a report provided to Adelphia on November 13th, Rembrandt's damages expert has opined that the *Georgia-Pacific* analysis in this case yields a reasonable royalty range of 4%-5%, which translates into an administrative claim of approximately $92 million to $115 million.

6.     In an effort to avoid unnecessary litigation, Rembrandt's counsel sent a letter dated September 20, 2006 (attached hereto as Exhibit C) to the Debtors' counsel to request whether Adelphia was prepared to establish a separate cash reserve to be used solely for the purpose of satisfying the Rembrandt Administrative Claim once such claim became an Allowed Administrative Claim. As of the date hereof, the Debtors' counsel has advised Rembrandt that the Debtors do not intend to establish such reserve.

7.     During the November 14, 2006 pre-trial conference in connection with the adversary proceeding, this Court established Wednesday, November 29 as the deadline for the parties to reach agreement, if any, as to the amount to be held in reserve to satisfy the Rembrandt Administrative Claim upon the same becoming an Allowed Administrative Claim. As the deadline for objections to the Plan is Friday, November 24, Rembrandt files this Objection for the purpose of ensuring that confirmation of the Plan shall be conditioned upon the creation of a separate reserve which shall be used solely to pay the Rembrandt Administrative Claim once such claim is Allowed. The hearing on the estimation of the Rembrandt Administrative Claim for the purposes of determining the amount to be held in reserve for such claim is scheduled for Tuesday, December 12.

**Background Concerning Rembrandt Technologies, LP**

8.      Although Rembrandt's business model is irrelevant to the merits of its

infringement claims and the basis for this Objection, defense counsel's characterization of

Rembrandt as a "patent troll" requires a brief response.  *See* Transcript of November 14, 2006

hearing at 17.  Created in 2004, Rembrandt has a $150 million commitment to be used to

purchase intellectual property assets such as patents, and to employ outside counsel to enforce

those property rights on a non-contingent basis.  Although Rembrandt is not providing cable

modem services related to the patents-in-suit, it enables investors and assignees of inventors to

realize the value of the inventions through significant participation in the proceeds earned by

Rembrandt's enforcement actions.  Moreover, by helping to create a market for quality patents,

Rembrandt not only enables inventors to realize the value of their inventions, it encourages

further inventions.

9.      Rembrandt's President and Chief Executive Officer, Dr. Paul Schneck, is

a world-renowned scientist and inventor whose numerous contributions have been recognized

by, *inter alia*, his receipt of the National Foreign Intelligence Community Seal Medallion

(awarded by the U.S. Director of Central Intelligence).  *See* Dr. Schneck's CV (attached hereto

as Exhibit D).  Among his numerous accomplishments in the development of new technologies,

Dr. Schneck holds two patents relating to the protection of intellectual property:  (1) U.S. Pat.

No. 6,314,409, "System for Controlling Access and Distribution of Digital Property," issued

November 6, 2001; and (2) U.S. Pat. No. 5, 933,498, "System for Controlling Access and

Distribution of Digital Property," issued August 3, 1999.

10.      Rembrandt purchases and becomes the assignee of the patents it invests in,

and Rembrandt typically shares any royalties recovered by its enforcement efforts with the

inventors or the patent's prior assignee.  Indeed, that is the case in the patent infringement

adversary proceeding before this Court:  Paradyne, the original assignee of the patents-in-suit

and the inventors' then-employer, retains a significant interest in any royalties collected on the patents.[3]

      11.    Rembrandt's screening process for its patent portfolio is exhaustive and extremely selective, both during the acquisition process and during its pre-litigation due diligence.  Specifically, fewer than ten percent of all patent portfolios considered by Rembrandt result in an acquisition.

## Objection

### Absent a Dedicated Reserve for the Rembrandt Administrative Claim, the Plan Violates Sections 1129(a)(9) and 1129(a)(11) of the Bankruptcy Code

      12.    Section 1129(a)(9) of the Bankruptcy Code requires that all administrative expense claims be paid in full.  11 U.S.C. § 1129(a)(9).  Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of a plan, that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. §1129(a)(11).  This condition is "commonly referred to as the feasibility requirement." *In re Adelphia Business Solutions*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003).

      13.    Accordingly, the Plan must provide for the payment in full of all Allowed Administrative Expense Claims asserted against the Debtors, and the means for such payment.  While Section 6.3(e) of the Plan provides that the holder of each Allowed Administrative Claim will receive payment in full, the Plan fails to provide the Plan Administrator the proper amount of cash to pay such claims, including the Rembrandt Administrative Claim.

      14.    Unlike the reserves established for each class of unsecured claims, *see* Plan § 11.5(b), the Plan does not establish any specific reserve for Administrative Claims.

---

[3]    In addition, and in keeping with its founders' values, Rembrandt donates approximately twenty percent of its net profits to charitable organizations, including the Rembrandt Foundation, a charitable organization dedicated to improving primary education throughout the United States.

          

Instead, the Plan's definition of "Available Cash" demonstrates that the Debtors are required to set aside cash necessary to satisfy Administrative Claims, including such claims that are Disputed as of the Effective Date:

> Available Cash means the aggregate amount of Cash of the Debtors as of the Effective Date, including any Cash available from Identified Sources as of the Effective Date, *less* the amount of (a) Cash necessary to satisfy United States Trustee fees, Administrative Claims, Fee Claims . . . or Secured Claims against the Debtors, including Disputed Claims of the foregoing[.]

Plan at A-9. Under the Plan's definition of "Disputed," claims not previously Allowed are deemed Disputed until the applicable Claims Objection Deadline, except as determined by the Debtors, the Plan, or the Plan Administrator. Plan at A-17. The Claims Objection Deadline for Administrative Claims is thirty days "after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of the Administrative Claim or such later date as may be approved by the Bankruptcy Court . . . [.]" Plan § 6.2(c). Under the foregoing Plan provisions, the Rembrandt Administrative Claim is presently a Disputed Administrative Claim. Absent the estimation of the Rembrandt Administrative Claim for purposes of the reserve, the Plan itself – particularly the definition of Available Cash – requires that the Debtors set aside an amount equal to the asserted amount of the Rembrandt Administrative Claim.

15.     The Plan provides for the Available Cash to be distributed to certain pre-petition unsecured creditors on the Effective Date. *See, e.g.,* Plan § 10.13. After the amount of Available Cash is determined as of the Effective Date, the only source of funds to satisfy all Allowed Administrative Claims will be the cash withheld to satisfy such claims. The Debtors' assets have been sold and the Plan, for all of its complexity, is essentially a "pot plan." There is no reorganized debtor that will be generating cash through operations to satisfy Administrative Claims. Accordingly, in the event the Debtors fail on the Effective Date to retain sufficient cash to satisfy all Administrative Claims that may be ultimately Allowed, there simply will not be enough cash to satisfy all Allowed Administrative Claims in full.

16.    If the Effective Date were to take place after the bar date for filing Administrative Claims, this risk could easily be addressed by the Debtors retaining cash in the asserted amount of such claims or in such amount as determined by this Court pursuant to one or more estimation hearings.  However, the Plan provides that the bar date for filing Administrative Claims will be forty days after the Debtors serve a Notice of Confirmation (the "Administrative Claims Bar Date").  Plan § 6.2(a).  As one of the conditions to the Effective Date is that such date occur by December 22, 2006, there will be a substantial period during which Administrative Claims may be timely filed well after the amount of Available Cash has been determined and distributed to pre-petition unsecured creditors.  *See* Plan § 12.2(c).

17.    Simply put, the Plan contains a structural error that is built upon an inherently invalid assumption – that the Debtors can somehow accurately determine the amount of Administrative Claims that will be filed during the period beginning on the Effective Date and ending on the Administrative Claims Bar Date.  As the Disclosure Statement acknowledges that the Debtors' estimate set forth therein of Administrative Claims that will eventually be Allowed does not reflect "[t]he impact of Administrative Claims that have not yet been asserted or were asserted too late to determine the extent to which they are ultimately likely to be Allowed[,]" *see* Disclosure Statement at DSS2-34 n.1, the Debtors have effectively admitted that they will not be able to determine the amount of Allowed Administrative Claims that will be filed after the Effective Date.

18.    Sections 1129(a)(9) and 1129(a)(11) of the Bankruptcy Code, as well as the absolute priority rule, forbid confirmation of a plan of reorganization that does not provide for the payment in full of all allowed administrative claims.  As presently structured, the Plan subjects creditors asserting presently Disputed Administrative Claims that ultimately become Allowed Administrative Claims to the unacceptable risk that the cash held for payment of Administrative Claims will be exhausted by payments in respect of Administrative Claims that

are timely filed after the Effective Date but which are Allowed and paid before the presently

Disputed Administrative Claims are Allowed.

19.     In view of the foregoing, confirmation of the Plan must be conditioned

upon the establishment of a separate cash reserve that will be used solely to satisfy the

Rembrandt Administrative Claim upon such claim becoming an Allowed Administrative Claim.

As noted above, the amount of such reserve will be determined by this Court pursuant to the

estimation hearing scheduled for Tuesday, December 12.[4]

[remainder of page intentionally left blank]

---

[4]     In the event that the Rembrandt Administrative Claim is ultimately Allowed in an amount greater than the reserve, Rembrandt reserves the right to seek payment of such Allowed Administrative Claim from the cash then held by the Plan Administrator for the purpose of paying Allowed Administrative Claims.

**<u>Conclusion</u>**

WHEREFORE Rembrandt respectfully requests that this Court condition

confirmation of the Plan upon the establishment of a cash reserve that that will be used solely to

satisfy the Rembrandt Administrative Claim upon such claim becoming an Allowed Claim, and

granting the relief requested herein and such other and further relief as may be warranted and

just.

Dated:  New York, New York
        November 22, 2006

                                      By: /s/ James L. Garrity, Jr.
                                          James L. Garrity, Jr. (JG-8389)
                                          Marc B. Hankin (MH-7001)
                                          SHEARMAN & STERLING LLP
                                          599 Lexington Avenue
                                          New York, New York  10022
                                          Telephone:  (212) 848-4000
                                          Facsimile:  (212) 848-7179

                                          Co-Counsel to Rembrandt Technologies, LP

                                          Vineet Bhatia (VB-9964)
                                          Max L. Tribble, Jr. (*Pro Hac Vice*)
                                          Edgar Sargent (*Pro Hac Vice*)
                                          Joseph S. Grinstein (*Pro Hac Vice*)
                                          Brooke A.M. Taylor (*Pro Hac Vice*)
                                          Tibor L. Nagy (*Pro Hac Vice*)
                                          SUSMAN GODFREY L.L.P.
                                          590 Madison Ave., 8th Floor
                                          New York, NY  10022
                                          Telephone:  (212) 336-8330
                                          Fax:  (212) 336-8340

                                          Co-Counsel to Rembrandt Technologies, LP

**Exhibit F**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|                                          | :  |                          |
|------------------------------------------|----|--------------------------|
|                                          | :  | **Chapter 11**           |
|                                          | :  |                          |
| **In re:**                               | :  | **Case No.  02 – 41729 (REG)** |
|                                          | :  |                          |
| **ADELPHIA COMMUNICATIONS**              | :  | **(Jointly Administered)** |
| **CORPORATION., *et al.,***              | :  |                          |
|                                          | :  |                          |
|                      **Debtors.**        | :  |                          |
|                                          | :  |                          |
|                                          | :  |                          |
-------------------------------------------------------------x

## STIPULATED ORDER ESTABLISHING SEPARATE RESERVE FOR REMBRANDT TECHNOLOGIES, LP ADMINISTRATIVE CLAIM

WHEREAS, on September 13, 2006, Rembrandt Technologies, LP ("Rembrandt") commenced an adversary proceeding against Adelphia Communications Corporation and certain of its subsidiaries and affiliates alleging post-petition patent infringement and filed an administrative claim in the above-captioned case with respect to the damages arising from such alleged infringement (the "Rembrandt Administrative Claim").[1]

WHEREAS, the Debtors dispute the Rembrandt Administrative Claim and intend to vigorously defend against it; and

WHEREAS, this Court has scheduled a hearing for the purpose of estimating the Rembrandt Administrative Claim solely for the purpose of determining the amount of cash to be reserved in respect of such claim upon the occurrence of the Effective Date of the Plan; and

WHEREAS, on November 22, 2006, Rembrandt filed an objection to confirmation of the Plan (the "Rembrandt Plan Objection"), requesting that this Court condition confirmation of the Plan upon the establishment of a cash reserve that would be used solely to

---

[1]    Capitalized terms not defined herein shall have the meanings attributed to them in the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors, dated October 16, 2006 (as may be further modified or amended, the "Plan").

satisfy the Rembrandt Administrative Claim upon such claim becoming an Allowed

Administrative Claim; and

WHEREAS, the Debtors and Rembrandt have engaged in negotiations and agreed

on the amount of cash to be reserved in respect of the Rembrandt Administrative Claim.

NOW, THEREFORE, IT IS HEREBY:

**ORDERED,** that on the Effective Date of the Plan, the Debtors shall establish a

separate reserve that shall be maintained and used as set forth herein (the "Dedicated Rembrandt

Reserve"), and such reserve shall be funded in the amount of $35 million; and it is hereby

**ORDERED,** that pursuant to the Plan and as shall be provided in the

Confirmation Order, the Plan Administrator shall disburse funds from the Dedicated Rembrandt

Reserve to Rembrandt to the extent that the Rembrandt Administrative Claim becomes an

Allowed Administrative Claim, and the Plan Administrator shall only use such funds for any

other purpose pursuant to the Plan (a) after the Rembrandt Administrative Claim is fully

adjudicated pursuant to a Final Order and (b) after the Allowed Rembrandt Administrative Claim

is paid in full; and it is hereby

**ORDERED,** that this Stipulated Order and the establishment of the Dedicated

Rembrandt Reserve are without prejudice to Rembrandt's right to obtain payment from all other

available sources of cash under, and pursuant to, the Plan, to the extent that there are any such

sources beginning as of the date that the Rembrandt Administrative Claim becomes Allowed, in

the event that the Rembrandt Administrative Claim is Allowed in an amount greater than the

funds held in the Dedicated Rembrandt Reserve; and it is hereby

**ORDERED,** that no provision of this Stipulated Order shall be deemed an admission of liability with respect to the Rembrandt Administrative Claim or an admission as to the ultimate amount of damages properly attributable to that Claim, and this Stipulated Order shall be without prejudice to the respective litigation positions of the parties hereto, and it is hereby

**ORDERED,** that subject to the terms of this Stipulated Order, the Rembrandt Plan Objection shall be deemed withdrawn with prejudice.

Dated:  December _13_, 2006

 *S/ Robert E. Gerber*
 HONORABLE ROBERT E. GERBER
 UNITED STATES BANKRUPTCY JUDGE


Dated:  December 12, 2006

WILLKIE FARR & GALLAGHER, LLP          SHEARMAN & STERLING LLP


By: /s/ Shelley C. Chapman          By: /s/ James L. Garrity, Jr.
Roger Netzer (RN-7190)          James L. Garrity, Jr. (JG 8389)
Shelley C. Chapman (SC-4691)          Marc B. Hankin (MH 7001)
787 Seventh Avenue          599 Lexington Avenue
New York, NY  1019-6009          New York, NY  10022
Main Telephone:  (212) 728-8000          Main Telephone:  (212) 848-4000
          Main Fax:  (212) 848-7179



Attorneys for Debtors and          Attorneys for Rembrandt Technologies, LP
Debtors in Possession


          SUSMAN GODFREY L.L.P.

          Vineet Bhatia (VB 9964)
          Max L. Tribble, Jr. (*Pro Hac Vice*)

          590 Madison Ave., 8th Floor
          New York, NY  10022
          Main Telephone:  (212) 336-8330
          Main Fax:  (212) 336-8340

          Attorneys for Rembrandt Technologies, LP

3

## CERTIFICATE OF SERVICE

I, Mark A. Ryan, declare that on March 2, 2007, I caused to be served true and correct copies of

the following:

**DECLARATION OF EILISH M. CAHALAN IN SUPPORT
OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION TO WITHDRAW THE
REFERENCE TO BANKRUPTCY COURT**

upon the following persons in the manner described below:

| **By Federal Express (Next Business Day):** | **By Federal Express (Next Business Day):** |
|---|---|
| James L. Garrity, Jr., Esq. | Vineet Bhatia, Esq. |
| Shearman & Sterling LLP | Susman Godfrey LLP |
| 599 Lexington Avenue | 590 Madison Avenue |
| New York, NY 10022 | 8th Floor |
| | New York, NY 10022 |
| *Attorneys for Plaintiff* | |
| | *Attorneys for Plaintiff* |

Executed this 2nd day of March, 2007, at New York, New York.


_____
Mark A. Ryan